Dean T. Kirby, Jr. 090114
Roberta S. Robinson 099035
KIRBY & McGUINN, A P.C.
707 Broadway, Suite 1750
San Diego, California 92101-5393
Telephone: (619) 685-4000
Facsimile: (619) 685-4004

Attorneys for Plaintiffs
Odyssey Reinsurance Company

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ODYSSEY REINSURANCE COMPANY, a Connecticut corporation<br><br>Plaintiff<br><br>v.<br><br>UNISON AGREEMENT CORP., a Delaware corporation and ODIN NEW HORIZON REAL ESTATE FUND, LP, a Delaware limited partnership; and ODIN NEW HORIZON GENERAL PARTNER, LLC, as Delaware limited liability company<br><br>Defendants | Case No. 3:21-cv-00011 BTM-WVG<br><br>FIRST AMENDED COMPLAINT |

Odyssey Reinsurance Company ("Odyssey Re" or "Plaintiff") alleges as follows:

PARTIES:

1. Plaintiff Odyssey Re is a Connecticut corporation. Its principal place of business, and its chief executive offices, are in the State of Connecticut.

2. Plaintiff is informed and believes and, based thereupon, alleges: Defendant Unison Agreement Corp. ("Unison") is a Delaware corporation. Its principal place of business, and its chief executive offices, are in the State of California.

3. Plaintiff is informed and believes and, based thereupon, alleges: Defendant Odin New Horizon Real Estate Fund LP ("Odin, LP") is a Delaware limited partnership. Its principal place of business, and its chief executive offices, are in the State of California.

4. Plaintiff is informed and believes and, based thereupon, alleges: Defendant Odin New Horizon General Partner, LLC ("Odin GP) is a Delaware limited liability company. Odin GP is the general partner of Odin, LP. Its principal place of business, and its chief executive offices, are in the State of California. References in this Complaint to "Odin" refer to both Odin, LP and its general partner Odin GP.

5. In all of the matters herein alleged, Unison and Odin acted as the principals and agents of one another.

JURISDICTION:

6. Jurisdiction over this action is based upon diversity of citizenship pursuant to 28 U.S.C. §1332. Odyssey Re is a citizen of the State of Connecticut. Defendants are, each of them, citizens of the State of California. The amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs.

/ / /

/ / /

VENUE:

7. Venue of this action in the Southern District of California is proper pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims for relief alleged in this Complaint occurred there.

ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

8. At all relevant times, Odyssey Re was, and is, a creditor of Diane Dostalik. Ms. Dostalik was formerly the wife of Richard Nagby, and her name was formerly Diane Nagby. These two individuals are referred to collectively in this Complaint as the "Nagbys."

9. The Nagbys were and are the 100% shareholders of Cal-Regent Insurance Company, a California corporation. The principal place of business of Cal-Regent was in El Cajon, California.

10. Odyssey Re and Cal-Regent were parties to a series of reinsurance agreements. After Cal-Regent refused to pay a debt Odyssey Re which was owing under those agreements, Odyssey Re was forced to sue Cal-Regent in the United States District Court for the District of Connecticut, in Case No. 3:14-cv-00458-VAB (the "Connecticut Action"). In October and November, 2015, a money Judgment and Supplemental Judgment in the total amount of $3,200,000 were entered in the Connecticut Action, in favor of Odyssey Re and against Cal-Regent (the "Connecticut Judgment").

11. In the meantime, in order to avoid paying the debt to Odyssey Re, the Nagbys caused the business of Cal-Regent to be transferred to a new corporation, Pacific Brokers Insurance Services ("PBIS"). Shortly thereafter, the business was sold by PBIS to AmTrust North America, Inc., an unrelated third party. The purchase price

included a $3 Million cash down payment which was immediately distributed to the Nagbys, including $2,500,000 to Diane Nagby, nee Dostalik.

12. In order to enforce the Connecticut Judgment, Odyssey Re filed an action in the United States District Court for the Southern District of California, Case No. 3:16-cv-03038-BTM-WVG (the "Fraudulent Transfer Action"). The Fraudulent Transfer Action named several defendants including PBIS and the Nagbys, alleging among other things that the distribution of the AmTrust proceeds by PBIS to the Nagbys was voidable under the California's Uniform Fraudulent Transfer Act.

13. The Court entered a preliminary injunction which required the Nagbys to deposit all of the AmTrust proceeds, already received and to be received, to the registry of the Court. A copy of this preliminary injunction is attached as Exhibit 1. No portion of the $3 Million AmTrust down payment, (nor a subsequent $894,583.19 "Earn Out Payment" paid by AmTrust to PBIS and distributed by PBIS to Mr. Nagby) was ever deposited to the registry.

14. During the Fraudulent Transfer Action, discovery and investigation proceeded in order to determine how $2,500,000 in AmTrust proceeds received by Ms. Dostalik were disposed of. Based on evidence uncovered by Odyssey Re, the Court entered an Order to Show Cause why Ms. Dostalik should not be held in contempt of the preliminary injunction for failure to deposit certain funds to the registry and to produce documents showing disposition of the funds. A copy of that Order to Show Cause is attached as Exhibit 2.

15. During the pendency of the contempt proceedings, Odyssey Re discovered that Ms. Dostalik was in the process of selling her home at 2201 Weld Blvd, El Cajon ("Weld Blvd."). On November 2, 2018, Odyssey Re filed an ex parte

application seeking a temporary restraining order requiring that the proceeds of sale of Weld Blvd. be deposited to the registry.

16. The Court in the Fraudulent Transfer Action granted the Application and entered a Temporary Restraining Order on November 7, 2018. The TRO required that the Weld Blvd sale proceeds be deposited to the registry as security for any damages suffered by Odyssey Re as a result of Ms. Dostalik's contempt. The TRO provided that only the following deductions could be made from the sale proceeds: (i) any unpaid real property taxes and assessments then due and owing; (ii) all sums secured by the existing first mortgage; (iii) brokerage commission; and (iv) prorations, escrow fees and closing costs. The TRO was recorded with the San Diego County Clerk on November 9, 2018. A conformed copy of the recorded TRO is attached as Exhibit 3. Recordation of the TRO gave actual and constructive notice that Odyssey Re had a beneficial interest in the equity of Weld Blvd. Odyssey Re relied on the TRO, and the recording of the TRO. Odyssey Re believed, reasonably, that no lender would encumber Weld Blvd. without examining title, which would have revealed the interest of Odyssey Re.

17. After a series of evidentiary hearings, the Court entered an Order holding Ms. Dostalik in contempt, based upon detailed findings (the "Contempt Order"). A copy of the Contempt Order is attached as Exhibit 4. The TRO remained in effect until it was converted to a preliminary injunction by the Contempt Order. The Contempt Order states in part that "[p]laintiff would be irreparably harmed in the event that Defendant sells the property and transfers the proceeds. Again, the balance of equities tips strongly in Plaintiff's favor, because Defendant has already failed to

deposit over $725,000 of AmTrust proceeds in the Court registry and has testified that she no longer has access to this money."

18. On August 30, 2019, the Court entered a "Judgment on Second Amended Complaint of Plaintiff Odyssey Reinsurance Company as to Defendant Diane Dostalik Only." That Judgment has become final. The Judgment, a copy of which is attached as Exhibit 5, awarded $3,208,150.68 in damages to Odyssey Re against Diane Dostalik. The Judgment also continued the preliminary injunction in effect as a permanent injunction. An Abstract of Judgment was recorded with the San Diego County Clerk on September 9, 2019. The above-captioned lawsuit constitutes an action on the Judgment within the meaning of California Code of Civil Procedure section 683.050.

19. The injunction orders entered in the Fraudulent Transfer Action, beginning with the TRO, which was recorded on November 9, 2018, set aside the equity in Weld Blvd. above and beyond the existing first mortgage, as protection and security for recovery of the AmTrust proceeds that Ms. Dostalik had withheld. After the TRO was obtained, Ms. Dostalik cancelled the pending sale of Weld Blvd.

20. Plaintiff is informed and believes and, based thereupon, alleges: On about April 2019, while the TRO was in effect, Ms. Dostalik entered into a transaction with Defendant Unison which was styled as a "Homeowner Agreement." Under the Homeowner Agreement, Unison advanced the principal sum of $144,375.00 to Ms. Dostalik, who promised in turn that upon a sale of Weld Blvd. she would repay that amount plus a sum equal to one half any appreciation in the property value.

21. On April 15, 2019, Unison caused to be recorded: (i) a "Memorandum of Unison Homeowner Agreement," a copy of which is attached as Exhibit 6; and (ii) a "Unison Homeowner Deed of Trust and Security Agreement", a copy of which is

attached as Exhibit 7. The beneficiary named in the trust deed is Unison Agreement Corporation. Neither of these recorded documents stated the principal amount of any secured obligation. Instead, the trust deed recites that it secures "performance of those obligations to Beneficiary specified in the Unison Homeowner Agreement."

22. Also on April 15, 2019, an instrument entitled "Assignment of Unison Homeowner Agreement" was recorded in the Official Records of San Diego County. A copy of that instrument is attached as Exhibit 8. Plaintiff is informed and believes and, based thereupon, alleges: Odin did not acquire the Homeowner Agreement for reasonable value. Odin is a mere instrumentality and conduit nominated to hold documents and make demands for payment on behalf of Unison or its affiliates.

23. The Contempt Order required Ms. Dostalik to appear in Court for a status conference and that "(i)n the absence of purging of the contempt, Ms. Dostalik shall then and there surrender to the U.S. Marshal to be confined until she purges her contempt." Ms. Dostalik failed to appear, and a warrant was issued for her arrest on July 15, 2019. After entry of the Judgment, counsel for Ms. Dostalik filed a motion to vacate the arrest warrant, which was denied. Ms. Dostalik remains a fugitive.

24. On about December 12, 2019, after Ms. Dostalik had fled to avoid arrest, counsel for Odyssey Re was contacted by Re/Max Unlimited Escrow, and was informed that an escrow was open for the sale of the Weld Blvd. property. Re/Max requested that Odyssey Re submit a demand for payment of the Judgment.

25. Plaintiff is informed and believes and, based thereupon, alleges: While she was in hiding, Diane Dostalik signed purchase documents and escrow instructions for the sale of Weld Blvd. These called for payment to Unison of the sums owing under the Homeowner Agreement. Counsel for Odyssey Re contacted Unison and

reminded them of the terms of the TRO, the preliminary injunction and the Judgment, which required that the sale proceeds net of the first mortgage be deposited to the Court registry. Unison refused to allow escrow to close so that the net sale proceeds could be deposited to the registry.

26. Plaintiff is informed and believes and, based thereupon, alleges: The existence of the recorded TRO was not disclosed by Ms. Dostalik, or by Re/Max, to the buyer of the property, who was at first forced to stay in a hotel with his family while closing of the sale was delayed over the Christmas holiday. Unison remained intransigent, refusing to comply with the injunction, and it became clear that the sale would be lost, and Odyssey Re would suffer irreparable harm, if escrow were not allowed to close.

27. By its terms, the TRO prohibited both Ms. Dostalik and all of those acting in concert with her, from disposing of any proceeds of sale of Weld Blvd. in excess of the amount of real property taxes, commissions and closing costs, plus the balance of the first mortgage. The Unison Homeowner Agreement was an agreement to violate the TRO by encumbering that equity, such that it would not be turned over in the event of a sale of that property. In entering into the Homeowner Agreement, Ms. Dostalik and Unison conspired to and did act in concert to violate the TRO. Ms. Dostalik, Unison and Odin acted to effectuate the object and goal of the conspiracy when they refused to comply with the Judgment by causing the sale proceeds to be deposited to the Court registry.

28. On about March 17, 2020, Odyssey Re submitted a demand to escrow requiring that the net sale proceeds be deposited to the registry and reserving its right

to take action against Unison and Odin if they received money from the sale. A copy of that demand is attached as Exhibit 9.

29. Plaintiff is informed and believes and, based thereupon, alleges: On April 7, 2020, escrow for the sale of Weld Blvd. closed. Odin and/ or Unison received the sum of $144,375.00 directly from escrow. On April 7, 2020, Odin and/or Unison caused the deed of trust securing the Homeowner Agreement to be reconveyed. Attached as Exhibit 10 is a copy of the recorded Substitution of Trustee and Full Reconveyance.

30. The remaining net proceeds of the Weld Blvd. sale, $199,308.92, were disbursed from escrow by check payable to the court registry, as required by the TRO, preliminary injunction, and Judgment. That check was deposited to the Court registry. On October 29, 2020, the Court entered an order directing the Clerk to disburse the Weld Blvd. sale proceeds from the registry to Odyssey Re.

31. The net proceeds of sale of Weld Blvd. were property of Ms. Dostalik which was sequestered and set aside as security for the payment of damages to Odyssey Re resulting from Ms. Dostalik's contempt of court.

32. Plaintiff is informed and believes and, based thereupon, alleges: Prior to execution of the "Homeowner Agreement," Unison had actual and constructive notice of the recorded TRO, issued by the Court in the Fraudulent Transfer Action, setting aside the equity in Weld Blvd. for the protection of Odyssey Re. Notwithstanding this, Unison knowingly aided and abetted the actions of Ms. Dostalik to misappropriate that equity to her benefit, and for the benefit of Unison and Odin. The Homeowner Agreement allowed Ms. Dostalik to turn the equity in Weld Blvd into cash. That cash

was paid to her by Unison and then secreted and converted by Ms. Dostalik in violation of the injunctive orders of the Court.

33. Plaintiff is informed and believes and, based thereupon, alleges: In connection with the sale of Weld Blvd., Unison and Odin were fully aware that injunctive orders of the Court in the Fraudulent Transfer Action required that the sale proceeds of Weld Blvd., reduced only by the balance of the real property taxes, the first mortgage, commission and closing costs, be paid to the Court registry so that it would be subject to recovery by Odyssey Re. Notwithstanding this, Unison and Odin intentionally violated those orders by demanding and receiving from escrow the sum of $144,375.00. This sum was not deposited to the Court registry as required but was instead paid to Unison, and/or Odin. As a result, Unison and/or Odin were unjustly enriched.

34. As a result of the wrongful actions of Unison and Odin, as alleged above, Odyssey Re has suffered damages in the amount of $144,375.00.

FIRST CLAIM FOR RELIEF (Conversion)

35. Plaintiff realleges and incorporates here the allegations of paragraphs 1 through 34 above.

36. By virtue of the TRO, preliminary injunction and Judgment, Odyssey Re was granted a beneficial interest in the equity of Weld Blvd in excess of real property taxes, the existing first mortgage, commission and closing costs.

37. By their wrongful acts defendants, and each of them, disposed of and converted that equity to their own use. As a result, Odyssey Re suffered damages in an amount equal to the value of that equity, which was not less than $144,375.00.

38. The actions of Unison and Odin, as herein alleged, were undertaken with a willful and conscious disregard of the rights of Odyssey Re and were an exercise of malice within the meaning of California Civil Code section 3295(c)(1).

SECOND CLAIM FOR RELIEF (Money Had and Received)

39. Plaintiff realleges and incorporates here the allegations of paragraphs 1 through 38 above.

40. As a result of their wrongful actions, defendants received money in the amount of $144,375.00 that was intended to be protected and used for the benefit of Odyssey Re. That money was instead misappropriated by defendants, who were unjustly enriched in violation of equity and good conscience.

41. Defendants have not paid the money to Odyssey Re or into the Court registry, in violation of the TRO, preliminary injunction and Judgment entered by the Court.

THIRD CLAIM FOR RELIEF (Recovery of Funds Subject to Equitable Lien)

42. Plaintiff realleges and incorporates here the allegations of paragraphs 1 through 41 above.

43. The TRO, preliminary injunction and Judgment were an exercise of the Court's equitable power for remediation of the actions of Ms. Dostalik. These orders created a charge on Weld Blvd for the protection of Odyssey Re, in order to secure, with the equity in that property, the right of Odyssey Re to recover sums owing to it by Ms. Dostalik under the Uniform Fraudulent Transfer Act.

44. Unison and/or Odin took the sale proceeds of Weld Blvd., in the amount of $144,375.00, subject to that equitable lien. By taking and applying those proceeds to their own use, defendants were unjustly enriched.

<u>FOURTH CLAIM FOR RELIEF</u> (Imposition of Constructive Trust)

45. Plaintiff realleges and incorporates here the allegations of paragraphs 1 through 44 above.

46. By their wrongful actions, defendants, and each of them, misappropriated the equity in Weld Blvd., converting it to cash which was turned over to Ms. Dostalik, with the expectation and intent that Unison and Odin would profit from the transaction. By this transaction, Unison and Odin were unjustly enriched.

47. Pursuant to California Civil Code section 2224, Unison and/or Odin became, and are, the involuntary trustee of $144,375 paid to them in connection with the sale of Weld Blvd., which sum should be turned over for the benefit of Odyssey Re.

<u>FIFTH CLAIM FOR RELIEF</u> (Action on the Judgment)

48. Plaintiff realleges and incorporates here the allegations of paragraphs 1 through 47 above.

49. The wrongful actions of Unison and Odin, taken in concert with Ms. Dostalik, were intentional violations of the TRO, preliminary injunction and Judgment. Enforcement of the Judgment requires that $144,375 in sale proceeds misappropriated by Unison and Odin be paid to Odyssey Re, directly or indirectly by deposit to the Court registry and further order of the Court releasing funds from the registry to Odyssey Re.

WHEREFORE Plaintiff Odyssey Reinsurance Company prays for relief as follows:

/ / /

/ / /

FOR THE FIRST CLAIM FOR RELIEF:

50. For a money judgment in the amount of $144,375.00

51. For exemplary damages in an amount calculated to punish Unison and Odin, and each of them, and to deter other parties from engaging in harmful and contemptuous conduct in the future.

FOR THE SECOND CLAIM FOR RELIEF:

52. For a money judgment in the amount of $144,375.00

FOR THE THIRD CLAIM FOR RELIEF:

53. For a money judgment the amount of $144,375.00.

54. In the alternative, for an injunction requiring Unison and Odin to deposit the sum of $144,375.00 to the registry of the Court, subject to further order of the Court.

FOR THE FOURTH CLAIM FOR RELIEF:

55. For a money judgment in the amount of $144,375.00.

56. In the alternative, for an injunction requiring Unison and Odin to deposit the sum of $144,375.00 to the registry of the Court, subject to further order of the Court.

FOR THE FIFTH CLAIM FOR RELIEF

57. For a money judgment in the amount of $144,375.00

58. In the alternative, for an injunction requiring Unison and Odin to deposit the sum of $144,375.00 to the registry of the Court, subject to further order of the Court.

/ / /

/ / /

FOR ALL CLAIMS FOR RELIEF:

59. For costs of suit.

60. For such other and further relief as the Court deems just.

DATE: July 23, 2021

KIRBY & McGUINN, A P.C.

By: /s/ Dean T. Kirby, Jr.
Dean T. Kirby, Jr.
Attorneys for Plaintiff
Odyssey Reinsurance Company

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ODYSSEY REINSURANCE COMPANY, a Connecticut corporation,

Plaintiff,

v.

RICHARD KEITH NAGBY, DIANE NAGBY a.k.a. DIANE DOSTALIK; PACIFIC BROKERS INSURANCE SERVICES, a Nevada Corporation; CAL-REGENT INSURANCE SERVICES CORPORATION, a California corporation,

Defendants.

Case No.: 16-cv-03038-BTM-WVG

**INJUNCTION ORDER**

The Court has granted Plaintiff Odyssey Reinsurance Company a permanent injunction against Defendants Cal-Regent and Pacific Brokers Insurance Services ("PBIS"), and a preliminary injunction against Defendants Richard and Diane Nagby. The Court details the terms of the respective injunctions below.

//

**I. PERMANENT INJUNCTION**

It is hereby **ORDERED** that Defendants PBIS and Cal-Regent and any of their officers, agents, servants, employees, and those acting in active concert or participation with them who receive actual notice of this Order are **PERMANENTLY ENJOINED** and **RESTRAINED** from directly or indirectly:

(a) Transferring, assigning, disposing of or commingling any funds or property received in connection with the sale of PBIS to AmTrust North America, Inc. ("AmTrust"), including but not limited to all "earn out" distributions collected or to be collected from AmTrust.

**IT IS FURTHER ORDERED** that Defendants PBIS and Cal-Regent deposit in the registry of the Court by October 11, 2017 all funds already received in connection with the sale of PBIS to AmTrust, and payments that are hereafter received from AmTrust or its agent within 24 hours of receipt.

**II. PRELIMINARY INJUNCTION**

It is hereby **ORDERED** that Defendants Richard and Diane Nagby and any of their officers, agents, servants, employees, and those acting in active concert or participation with them who receive actual notice of this Order are **PRELIMINARILY ENJOINED** and **RESTRAINED** from directly or indirectly:

(a) Transferring, assigning, disposing of or commingling any funds or property received in connection with the sale of PBIS to AmTrust, including but not limited to all "earn out" distributions collected or to be collected from AmTrust.

**IT IS FURTHER ORDERED** that Defendants Richard and Diane Nagby deposit in the registry of the Court by October 11, 2017 all funds already received in connection with the sale of PBIS to AmTrust, and payments that are hereafter received from AmTrust or its agent within 24 hours of receipt.

**IT IS FURTHER ORDERED** that the parties submit briefs within 7 days of

the entry of this Order addressing whether a bond should be required, and if so, in what amount.

**IT IS FURTHER ORDERED** the preliminary injunction shall remain in effect until further order of the Court.

The injunctions provided for herein shall take effect immediately. Defendants are warned that any act by them in violation of any of the terms of this Order may be considered and prosecuted as contempt of this Court.

**IT IS SO ORDERED**.

Dated: 7:02 PM, October 4, 2017,
San Diego

Barry Ted Moskowitz, Chief Judge
United States District Court

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ODYSSEY REINSURANCE COMPANY, a Connecticut corporation

Plaintiff

v.

RICHARD KEITH NAGBY, et al.

Defendants.

Case No. 3:16-cv-03038-BTM-WVG

**ORDER TO SHOW CAUSE WHY DEFENDANT DIANE NAGBY SHOULD NOT BE HELD IN CONTEMPT OF COURT**

**(ECF No. 182)**

On October 5, 2018, Plaintiff Odyssey Reinsurance Company submitted an ex parte application for an order to show cause why Defendant Diane Nagby should not be held in contempt of Court and for an order compelling execution of consent directive, transfer of funds, and compliance with discovery demands (ECF No. 182). Defendant was given until October 22, 2018 to file a written opposition to the Application (ECF No. 185) but did not do so.

Plaintiff's request for an order compelling execution of a consent directive, transfer of funds, and compliance with discovery demands will be ruled upon separately after the next hearing in this case set for December 20, 2018, 10:30 am.

With respect to the request for an order to show cause why Defendant Diane Nagby should not be held in contempt of Court, the Application is granted as follows:

Defendant Diane Nagby shall personally appear in Courtroom 15B of the above-captioned Court, located at 333 W Broadway, San Diego, California, on December 20, 2018, 10:30 am, to show cause, if any, why this Court should not find her in contempt of the injunction order entered on October 4, 2017 (ECF No. 69 ("the October 2017 Injunction Order")), the injunction order entered on May 4, 2018 (ECF No. 137 ("the May 2018 Injunction Order")), and the temporary restraining order entered on August 8, 2018 (ECF No. 172 ("the August 2018 TRO").)

ALLEGED CONTEMPT:

1. Ms. Nagby is notified that the alleged contempt consists of the failure to deposit into the registry of this Court, the sum of $152,580.51, alleged to consist of proceeds of the sale of assets of Pacific Brokers Insurance Services, Inc. ("PBIS") that she transferred to Caye International Bank in an account held in the name of Nevada Cactus Growers, LLC, to the extent the account was closed or the funds were transferred after October 4, 2017, the date of entry of the October 2017 Injunction Order.

2. The alleged contempt also consists of transferring, disbursing, or effecting disbursement of any and all funds maintained at Caye International Bank in an account held in the name of Nevada Cactus Growers, LLC after May 4, 2018, the date of entry of the May 2018 Injunction Order.

3. The alleged contempt also consists of failure to deposit into the registry of this Court, the sum of $556,558.77 ($490,933.77 originally invested and $65,625 subsequently collected), alleged to consist of proceeds of the sale of assets of PBIS that she transferred or disbursed and collected from an account held in the name of the 2015 Diane M. Dostalik Trust with Rich Uncle’s REIT after October 4, 2017, the date of entry of the October 2017 Injunction Order.

4. The alleged contempt also consists of transferring, disbursing, or effecting disbursement of any and all funds maintained in an account held in the name of the 2015 Diane M. Dostalik Trust with Rich Uncle’s REIT after May 4, 2018, the date of entry of the May 2018 Injunction Order.

5. The alleged contempt also consists of failure to provide any documents or substantive information regarding the disposition of any income or proceeds of accounts at Caye International Bank, Rich Uncles REIT, or Bitcoin, or any undocumented information necessary to gain access to Caye International Bank, Rich Uncles REIT and Bitcoin accounts on or after September 7, 2018, the date Ms. Nagby was ordered to provide such information and documents pursuant to the August 2018 TRO.

//

//

THE AUGUST 2018 OSC RE CONTEMPT:

Defendant Diane Nagby is also expected to personally appear on December 20, 2018, 10:30 am, to continue to show cause, if any, why this Court should not find her in contempt by failing to deposit into the Court registry the sum of $184,001.57, alleged to consist of the sale of assets of PBIS in her possession, custody, or control on October 4, 2017, the date of entry of the October 2017 Injunction Order.

Ms. Nagby is further notified that any contempt order to issue may require the following acts in order to purge the alleged contempt:

1. Deposit the sum of $184,001.57 in the Court registry.

2. Deposit the sum of $152,580.51 in the Court registry.

3. Deposit the sum of $556,558.77 ($490,933.77 originally invested and $65,625 subsequently collected) in the Court registry.

Ms. Nagby is further notified that if she is found in contempt, she may be immediately committed to the custody of the U.S. Marshall, or assessed a daily fine until she purges her contempt. She may also be ordered to pay Odyssey Re's attorney's fees and costs incurred.

**IT IS SO ORDERED.**

Dated: December 10, 2018

Barry Ted Moskowitz, Chief Judge
United States District Court

PLEASE COMPLETE THIS INFORMATION.

RECORDING REQUESTED BY:
Dean T. Kirby, Jr.

AND WHEN RECORDED MAIL TO:
Kirby & McGuinn, A P.C.
707 Broadway, Suite 1750
San Diego, CA 92101

DOC# 2018-0469299

Nov 09, 2018 11:53 AM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES: $98.00 (SB2 Atkins: $75.00)
PCOR: N/A
PAGES: 4

*THIS SPACE FOR RECORDER'S USE ONLY*

Temporary Restraining Order & Order to Show Cause re Property at 2201 Weld Blvd., El Cajon, CA

(Please fill in document title(s) on this line)

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
(Additional recording fee applies)

9/95
Rec.Form #R25

FILED
NOV 0 7 2018
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ODYSSEY REINSURANCE COMPANY, a Connecticut corporation<br><br>Plaintiff<br><br>v.<br><br>RICHARD KEITH NAGBY, et al.<br><br>Defendants. | Case No. 3:16-cv-03038-BTM-WVG<br><br>TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE<br><br>RE PROPERTY AT 2201 WELD BLVD EL CAJON, CA |

Plaintiff Odyssey Reinsurance Company has submitted an Application for Temporary Restraining Order and for Order to Show Cause Why Preliminary Injunction Should Not Issue Re Property at 2201 Weld Blvd El Cajon, California. Good cause appearing,

/ / /

/ / /

IT IS HEREBY ORDERED:

Diane Nagby, aka Diane Dostalik, individually and in her capacity as the Trustee of the 2015 Diane Dostalik Trust, and Green Tree Funding, LLC, and their agents, employees and all of those acting in concert with them are enjoined as follows:

1. In the event that the real property at 2201 Weld Blvd., El Cajon, CA, APN 386-652-33-00, is sold, the sales proceeds shall be paid to the registry of the United States District Court, Southern District of California after deducting:

1.1 Any unpaid real property taxes and assessments then due and owing;

1.2 All sums secured by the existing first mortgage;

1.3 Brokerage commission; and

1.4 Prorations, escrow fees and closing costs.

2. Ms. Nagby is authorized to, if necessary to complete a sale, cause to be reconveyed any trust deed naming as beneficiary Green Tree Funding, LLC.

3. Among the parties subject to this injunction are: (i) Corner Escrow, Inc.; and ABC Realty Carlsbad, Inc., and all real estate brokers and salespersons doing business under the name "Keller Williams Realty."

4. Diane Nagby, aka Diane Dostalik, and Green Tree Funding, LLC are ordered to appear on November 28, 2018 ~~(a date which is 14 days or less from the date of entry of this Order)~~ at 11 A.m. in Courtroom 15B, to show cause, if any they have, why a preliminary injunction should not issue having the same terms as stated above.

BTM
BTM

[CONTINUED ON FOLLOWING PAGE]

5. A certified copy of this Order may be recorded in the Official Records of San Diego County.

6. Any violation of this Order may be treated as a civil or criminal contempt of Court and may subject the violator to arrest and prosecution for such contempt.

DATE: 11/7/18

Barry Ted Moskowitz
UNITED STATES DISTRICT JUDGE

I hereby attest and certify on 11-9-18
That the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody.
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By M. Exler Deputy

Case 3:16-cv-03038-BTM-WVG Document 287 Filed 06/27/19 PageID.3605 Page 1 of 30

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ODYSSEY REINSURANCE COMPANY, a Connecticut corporation,<br>Plaintiff,<br>v.<br>RICHARD KEITH NAGBY, et al,<br>Defendants. | Case No.: 16-cv-3038-BTM-WVG<br>**ORDER HOLDING DEFENDANT DIANE DOSTALIK IN CONTEMPT AND GRANTING PRELIMINARY INJUNCTIONS**<br>**[ECF Nos. 199, 172, 194]** |

Before the Court is an order to show cause ("OSC") why Defendant Diane Dostalik, formerly known as Diane Nagby, ("Defendant") should not be held in contempt of Court. (ECF No. 199 ("December 2018 OSC re Contempt").) The OSC required that Ms. Dostalik show cause, if any, why the Court should not find her in contempt for violating:

- the injunction order entered on October 4, 2017, (ECF No. 69 ("October 4, 2017 Injunction Order"));
- the injunction order entered on May 4, 2018 (ECF No. 137 ("May 4, 2018 Injunction Order")); and

- the temporary restraining order entered on August 8, 2018 (ECF No. 172 ("August 8, 2018 TRO")).

For the reasons discussed below, the Court holds Defendant Diane Dostalik in civil contempt.

Also pending before the Court are two temporary restraining orders ("TROs") issued by the Court on August 8, 2018 and November 7, 2018. (August 2018 TRO; ECF No. 194 ("November 7, 2018 TRO").) Those orders required Defendant to show cause why preliminary injunctions should not issue having the same terms as the TROs. For the reasons discussed below, the Court grants the preliminary injunctions.

**<u>FACTUAL BACKGROUND</u>**

This action arises out of the judgment entered by the United States District Court for the District of Connecticut in favor of Plaintiff Odyssey Reinsurance Company ("Plaintiff" or "Odyssey") and against Defendant Cal-Regent Insurance Services Corporation ("Cal-Regent") in the amount of $3,200,000.00 plus interest. (See ECF No. ("Second Am. Compl. or SAC") ¶¶ 15–17.) Cal-Regent was an insurance agency that underwrote certain insurance risks on behalf of State National Insurance Company ("State National"). (SAC ¶ 18.) Plaintiff in turn reinsured State National for a certain percentage of those risks, ranging from 90%–100%. (Id.) In accordance with a series of reinsurance agreements between the parties, Cal-Regent received a provisional commission—paid in part by Plaintiff—on all policies that it underwrote for State National. (SAC ¶ 19.) At the end of each year, the provisional commissions were adjusted depending on the profitability of the business underwritten by Cal-Regent. (SAC ¶ 20.) Where the provisional commission paid by Plaintiff exceeded the amount to which Cal-Regent was entitled to after the yearly adjustment, Cal-Regent was obligated to pay the difference to Plaintiff. (Id.) By 2013, Cal-Regent owed Plaintiff $2,740,802.61 in return commissions, in part due to a lawsuit against State

Case 3:16-cv-03038-BTM-WVG Document 287 Filed 06/27/19 PageID.8607 Page 3 of 30

National that settled in February 2013. (SAC ¶¶ 21–23, 25.)

Plaintiff alleges that by early 2013, Defendants Richard Nagby and Diane Dostalik "understood that the amount of return commissions owing to [Plaintiff] would substantially increase" as a result of the lawsuit. (SAC ¶ 29.) Plaintiff claims that "[a]s the potential effect of the [lawsuit] on Cal-Regent's obligation to pay return commission became clear to the Nagbys, they embarked on a plan to strip Cal-Regent of assets," (SAC ¶ 30), which began with the Nagbys forming Pacific Brokers Insurance Services ("PBIS"), a Nevada corporation, (SAC ¶35).

Plaintiff alleges that Mr. Nagby, with the help of Defendants CTS and David Dostalik, "caused funds otherwise owing to Cal-Regent and/or to its successor PBIS to be transferred to one or more account(s) held in the name of CTS" to conceal funds from creditors including Plaintiff. (SAC ¶¶ 32, 40.7.) Defendant David Dostalik allegedly released to the Nagbys for their benefit, "portions of the funds held by CTS on behalf of Cal-Regent." (SAC ¶ 33.) Some of the funds were also deposited into the Cal-Regent and PBIS operating accounts to pay creditors, "in order to deceive them as to the true status of Cal-Regent and CTS." (Id.) "Other funds deposited into the Cal-Regent or PBIS operating accounts were characterized by the Nagbys as loans to those entities, so that payments back to the Nagbys could be characterized as tax-free loan repayments." (Id.)

Plaintiff also claims that in April 2013, while Cal-Regent's debts remained outstanding, Mr. Nagby and Ms. Dostalik formed PBIS and subsequently "caused Cal-Regent to transfer substantially all of its assets to PBIS," including its goodwill and "book of business," without receiving reasonably equivalent value in exchange for these assets. (SAC ¶¶ 35–36, 45.) Mr. Nagby and Ms. Dostalik are both Cal-Regent's and PBIS's officers, directors, managers and shareholders. (SAC ¶ 46.) Plaintiff alleges that "PBIS was formed by [Mr. Nagby and Ms. Dostalik] for the specific purpose of continuing the business operations of Cal-Regent under a different name in order to hinder, delay or defraud the

creditors of Cal-Regent." (SAC ¶ 49.)

In April 2014, Plaintiff filed an action in the District of Connecticut against Cal-Regent to recover the amount owed to Plaintiff in return commissions. (SAC ¶ 12.) In October 2015, the court rendered a judgment in Plaintiff's favor and against Cal-Regent in the amount of $2,740,802.61. (SAC ¶ 14.) In November 2015, the court awarded Plaintiff a supplement judgment. (SAC ¶¶ 15–17.) In addition to the October 2015 judgment the court also awarded Plaintiff $459,197.39, bringing the judgment to a total sum of $3,200,000.00 plus interest. (Id.)

Plaintiff alleges that "three months after oral argument on [Plaintiff's] motion for summary judgment in the Connecticut action and three months before the Judgment was entered, [Mr. Nagby and Ms. Dostalik] caused PBIS to sell substantially all of its assets to AmTrust North America, Inc. ("AmTrust") for $5 million." (SAC ¶ 37.) Of the sale proceeds ("the AmTrust proceeds"), AmTrust made an initial payment of $3 million to PBIS. (ECF No. 160-1, ¶¶ 3-4.) The remainder was to be paid in the form of contingent "earn out" payments in three annual installments. (ECF No. 165, Ex. 133, ¶ 3.)

As the only PBIS shareholders, Mr. Nagby and Ms. Dostalik decided how to allocate the AmTrust proceeds between the two of them during the course of their divorce proceedings. *See In re: Marriage of: Diane M. Nagby v. Richard K. Nagby*, No. ED80574, in the Superior Court of California, County of San Diego. Per the "Stipulation and Order Re Division of PBIS Sale Proceeds and Outstanding Post-Judgment Issues" signed by the parties in May 2015, the two agreed that Ms. Dostalik would receive $2.5 million of the initial $3 million payment, while Mr. Nagby would receive the remaining $500,000. *See id.* They also agreed that Mr. Nagby would receive the earn out payments. *Id.*

On August 4, 2015, Ms. Dostalik received $2.5 million, and Mr. Nagby received $500,000. (ECF No. 140-3, Ex. 77; ECF No. 160-1, ¶ 14; ECF No. 165,

Ex. 133 ¶¶ 2, 5.) In October 2016, AmTrust wired the first earn out payment in the amount of $894.583.19 to a PBIS bank account. (ECF No. 140-3, Ex. 543.) Mr. Nagby received those funds on October 21, 2016. (ECF No. 140-3, Ex. 544.)

## PROCEDURAL BACKGROUND

Plaintiff filed the SAC on March 21, 2017, against several defendants including PBIS, Cal-Regent, and the Nagbys under several theories of liability including the Uniform Fraudulent Transfer Act ("UFTA"), California's alter ego and successor liability law, and principles of corporate law. (SAC.)

On October 4, 2017, the Court granted Plaintiff's motion for the entry of a default judgment against Cal-Regent and PBIS in the amount of $3.2 million plus post-judgment interest. (See ECF No. 68.) The Court also granted Plaintiff a preliminary injunction against the Nagbys, restraining them from the dissipation of the AmTrust proceeds, including "all funds already received in connection with the sale of PBIS to AmTrust, and payments that are hereafter received from AmTrust." (ECF No. 69 ("October 2017 Injunction Order".).)

On October 10, 2017, a stipulated order was entered directing AmTrust to pay into the Court registry the second and third earn out payments. (See ECF No. 74 ("October 2017 Registry Order").) Plaintiff and AmTrust filed a joint motion to dismiss AmTrust without prejudice. (See ECF No. 84.) The dismissal order required that AmTrust continue to abide by the October 2017 Registry Order. (Id.) AmTrust has now deposited the second and third earn out payments, totaling $958,017.66, into the Court registry. (See ECF No. 223 ("Pl.'s Opp'n to Mot.-to-Interv."), 4:15-22.)

On October 27, 2017, the Court entered a judgment as to Cal-Regent and PBIS, including a monetary award against PBIS in the amount of $3,219,482.68, the amount owing on the District of Connecticut judgment against Cal-Regent. (ECF No. 82.) On March 5, 2018, the Court certified the judgment as final under Fed. R. Civ. P. 54(b). (ECF No. 105.) No appeal was taken.

On March 7, 2019, the Court denied a motion to intervene by third party Knight Insurance. (ECF No. 233.) On March 14, 2019, the Court granted a turnover motion in favor of Odyssey and directed payment of the AmTrust proceeds in the Court registry (the second and third earn out payments) to Odyssey. (ECF No. 234.) Knight Insurance has appealed both orders. (ECF Nos. 235, 236.) Mr. Nagby has appealed the order granting Plaintiff's turnover motion. (ECF No. 246.)

On April 22, 2019, the Court denied in part and granted in part a motion for summary judgment submitted by Defendants David Dostalik and CTS. (ECF No. 253.) Defendants David Dostalik and CTS have appealed the order. (ECF Nos. 263, 264.)

Pretrial dates have been set, culminating in the final pretrial conference scheduled for July 25, 2019. Trial is scheduled to begin August 19, 2019.

The Court has issued a series of injunctions and temporary restraining orders requiring Ms. Dostalik to deposit AmTrust proceeds in her possession into the Court registry, starting with the Court's October 4, 2017 Injunction Order. OSC proceedings as to why Ms. Dostalik should not be held in contempt with respect to those orders concluded on June 6, 2019. Below, the Court details the findings of fact and conclusions of law that serve as the basis for this Order holding Ms. Dostalik in civil contempt.

## DISCUSSION

### A. Contempt

A district court has the inherent power to enforce its orders through civil contempt. *See Shillitani v. United States*, 384 U.S. 364, 370 (1966). In the Ninth Circuit, a finding of civil contempt is proper when a party disobeys a specific and definite court order by failure to take all reasonable steps within the party's power to comply. *See Go-Video, Inc. v. Motion Picture Ass'n of America*, 10 F.3d 693, 695 (9th Cir. 1993).

The party moving the Court to adjudge another of contempt bears the initial burden of showing by clear and convincing evidence that the alleged contemnor has violated a specific and definite order of the Court. *See FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (citing *Stone v. City and Cty. of San Francisco,* 968 F.2d 850, 856 n.9 (9th Cir. 1992)). Upon such a showing, the burden shifts to the alleged contemnor to demonstrate why she was unable to comply. *Id.*

The inability to comply may constitute a defense to a charge of civil contempt. *Id.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). In raising this defense, the defendant has the burden of production. *Rylander*, 460 U.S. at 757. The party asserting the defense "must show categorically and in detail why he is unable to comply." *Affordable Media,* 179 F.3d at 1241. "The contempt need not be willful." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotation marks and citation omitted). "Contempt sanctions, however, are not warranted where the nonmoving party's action 'appears to be based on a good faith and reasonable interpretation' of the court's order." *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, No. 16-cv-01702-BLF, 2018 WL 2416242, at *2 (N.D. Cal, May 29, 2018) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695).

At the contempt hearing, the propriety of the underlying order is not at issue; rather, the question for the Court is whether the alleged contemnor has the present ability to obey the Court's order. *See Maggio v. Zeitz*, 333 U.S. 56, 69 (1948). "[A] contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *Maggio*, 333 U.S. at 69; *Rylander*, 460 U.S. at 756-57.

The Court finds that Ms. Dostalik has violated two specific and definite

Court orders by failing to take all reasonable steps within her power to comply. *See Go-Video, Inc. v. Motion Picture Ass'n of America*, 10 F.3d 693, 695 (9th Cir. 1993). Plaintiff's presentation of evidence has revealed several violations of both the October 4, 2017 Injunction Order and the August 8, 2018 TRO.

**1. Defendant Violated the October 4, 2017 Injunction Order**

**a. October 4, 2017 Injunction Order**

On October 4, 2017, the Court ordered that Ms. Dostalik is:

> Preliminary enjoined and restrained from directly or indirectly: (a) Transferring, assigning, disposing of or commingling any funds or property received *in connection with the sale of PBIS to AmTrust*, including but not limited to all "earn out" distributions collected or to be collected from AmTrust.

(October 4, 2017 Injunction Order, 2:15-23) (emphasis added).

The Court also ordered Ms. Dostalik to:

> deposit in the registry of the Court by October 11, 2017 all funds already received *in connection with the sale of PBIS to AmTrust*, and payments that are hereafter received from AmTrust or its agent within 24 hours of receipt.

(Id. at 2:24-27) (emphasis added).

Finally, the Court warned that any act "in violation of the terms of [the] Order may be considered and prosecuted as contempt of this Court." (Id. at 3:6-7.)

**b. Defendant Failed to Deposit At Least $176,263.13 in AmTrust Proceeds into the Court Registry**

The Court finds that on October 4, 2017, Ms. Dostalik had in her possession at least $176,263.13 in AmTrust Proceeds and failed to deposit these funds into the Court registry, in violation of the October 4, 2017 Injunction.

Ms. Dostalik initially received the $2.5 million payment in connection with the sale of PBIS to AmTrust on August 4, 2015 through an incoming wire

transfer.[1] (See Pl. Ex. 91A.) The testimony of Plaintiff's expert witness, Mr. Brian Bergmark, demonstrates what happened to the AmTrust proceeds from its initial deposit on August 4, 2015 to October 4, 2017, when the Court entered its Order. (See generally ECF No. 229 ("Tr. of OSC Hr'g on May 20, 2019" or "Tr. May 20, 2019"), 3-54.) Mr. Bergmark testified that in conducting his analysis of the $2.5 million, he relied on a method called proportional or allocation tracing.[2] (Id. at 17:9-12.) Mr. Bergmark explained that as the $2.5 million was transferred throughout Ms. Dostalik's various bank accounts or used to pay for expenses, he kept track of "two separate buckets of monies," one that consisted of AmTrust money and the other that consisted of personal funds. (Id. at 16:20-17:8.) With this tracing, Mr. Bergmark at all times tracked the proportion or percentage of each account balance consisting of AmTrust proceeds. (Id at 18-2019:13.) When money was transferred between accounts, Mr. Bergmark preserved the "character" of the funds, whether AmTrust or personal, to ensure that the percentage of AmTrust funds in each account remained accurate. (Id. at 20:16-22:2.) When money was used to pay for expenses, Mr. Bergmark attempted to characterize the type of expense as an AmTrust withdrawal or personal in nature. (Id. at 17:14-18:18.) He then subtracted the expense from the AmTrust funds or personal funds in the account accordingly. (Id.) Mr. Bergmark emphasized that for this part of the analysis, he was always "conservative," and would subtract expenses from the AmTrust money unless he could clearly identify that it was personal in nature. (Id.)

---

[1] Defendant has disputed Plaintiff's assertion that this $2.5 million wire transfer did in fact represent the proceeds that Ms. Dostalik received in connection with the sale of PBIS to AmTrust. However, Defendant has presented no evidence whatsoever that on August 4, 2015, Ms. Dostalik was in the receipt of $2.5 million from any other transactions not related to the sale of PBIS.

[2] Mr. Bergmark's complete testimony explaining proportional tracing can be found in the Tr. of OSC Hr'g on May 20, 2019, 15:13-22:20.

Mr. Bergmark analyzed nine of Ms. Dostalik's bank accounts to trace the initial $2.5 million deposit:

- Bank of the West Personal Checking (0019)
- Bank of the West Personal Money Market (0001)
- Wells Fargo Personal Checking (9396)
- Wells Fargo Personal Savings (9984)
- Wells Fargo Green Tree Funding LLC Checking (1268)
- Wells Fargo Green Tree Funding LLC "Additional" Checking (9404)
- Wells Fargo Green Tree Funding LLC Savings (9976)
- Chase Nevada Cactus Growers LLC Checking (6375)
- Chase Nevada Cactus Growers LLC Savings (7150)

(Id. at 14:5-15:11.) The $2.5 million was originally deposited into Bank of the West Personal Checking (0019) on August 4, 2015. (Pl. Ex. 91A; Tr. May 20, 2019, 15:20-16:4.) For the next two years, the money was disbursed throughout Ms. Dostalik's nine accounts. (Pl. Exs. 91, 93, 149.) From the date of the initial deposit to October 4, 2017, Mr. Bergmark testified that the total aggregate balance of the nine accounts was never less than 97% AmTrust proceeds. (Tr. May 20, 2019, 42:24-43:12.)

As of October 4, 2017, three[3] of Ms. Dostalik's accounts had balances consisting of both personal funds and AmTrust proceeds:

- Chase Nevada Cactus Growers LLC Savings (7150): The total account balance was $97,086.29, (Pl. Ex. 93C), $96,799.24 of which was AmTrust proceeds, (Tr. May 20, 2019, 33:1-10). The balance was 99.7% AmTrust proceeds. (Id. at 33:1-10.)
- Chase Nevada Cactus Growers LLC Checking (6375): The total

---

[3] Mr. Bergmark testified that on October 4, 2017, four accounts had balances consisting of AmTrust proceeds. (See Tr. of OSC Hr'g on May 20, 2019, 36:19-37:14.) Defendant did not object, nor did Defendant provide any evidence to the contrary. However, the record does not support the finding that the Wells Fargo Personal Checking (9396) had any funds remaining by October 4, 2017. (See Pl. Ex. 149.) The bank statements for this account included in Plaintiff's Exhibit 149 conclude with the statement from September 1-30, 2017, which reflects an ending balance of $0 on September 22, 2017. Thus, the Court finds that on October 4, 2017, only three of Ms. Dostalik's account balances included AmTrust funds.

account balance was $71,787.18, (Pl. Ex. 93D), $71,068.06 of which was AmTrust proceeds, (Tr. May 20, 36:2-13). The balance was 99.7% AmTrust proceeds. (Id. at 36:2-13.)

- Wells Fargo Green Tree Funding LLC Checking (1268): The total balance was $8,587.34, (Pl. Ex. 149), $8,395.83 of which was AmTrust proceeds, (Tr. May 20, 2019, 36:19-37:14). The AmTrust proceeds consisted of 97.7% of the funds in that account. (Id. at 36:19-37:14.)

Thus, the Court finds by clear and convincing evidence that on October 4, 2017, Ms. Dostalik had $176,263.13 of AmTrust money in three of her bank accounts that was accessible to be deposited into the Court registry. Because Ms. Dostalik failed to deposit these funds into the Court registry by the deadline on October 11, 2017, she is in contempt of the October 4, 2017 Injunction Order.

**c. Defendant Comingled and Transferred AmTrust Proceeds**

The Court finds that Ms. Dostalik first comingled AmTrust proceeds by depositing the proceeds of the sale of real estate into an account with a balance consisting of 99.7% AmTrust money and then transferring those comingled funds to a new account with an offshore bank, in violation of the October 4, 2017 Injunction Order.

Ms. Dostalik sold real estate she owned in Twin Peaks, California (“the Twin Peaks property”) in the fall of 2017. (Pl. Ex. 93C; Tr. May 20, 2019, 37:18-38:8.) On October 20, 2017 she received $297,306.04 in proceeds from the sale, which was deposited into Chase Nevada Cactus Growers LLC Savings (7150). (Id.) At the time, this account consisted of 99.7% AmTrust funds. (Tr. May 20, 2019, 33:1-10.) Between October 4 and 20, 2017, no other deposits or withdrawals were made. (Pl. Ex. 93C.) Thus, by depositing the Twin Peaks proceeds into Chase Nevada Cactus Growers LLC Savings (7150), Ms. Dostalik comingled the property sale funds with AmTrust proceeds, in an account that had been 99.7% AmTrust proceeds, in violation of the Court’s Order.

After the deposit of the Twin Peaks funds, Chase Nevada Cactus Growers

LLC Savings (7150) had a balance of $394,392.93. (Pl. Ex. 93C.) At this point, the account consisted of 24.54% AmTrust proceeds. (Tr. May 30, 2019 38:25-39:6.) On October 26, 2017, $37,000 was transferred from Chase Nevada Cactus Growers LLC Checking (6375) to the Savings (7150), bringing the balance of the Savings (7150) to $431,377.93. (Pl. Ex. 93C; Tr. May 30, 39:7-17.) That same day, Ms. Dostalik then transferred $431,077.93 from the Savings (7150) to the Checking (6375). (Pl. Exs. 93C, 93D.) The next day on October 27, 2017, Ms. Dostalik transferred via wire $431,377.93 from the Checking (6375) to an account at Caye International Bank ("Caye 2015 Diane M. Dostalik Trust (3164)"), again violating the Court's Order. (See Pl. Exs. 93D, 140C, 140N.)

Thus, Ms. Dostalik is in contempt of the Court's Order for multiple instances of comingling and transferring AmTrust funds between October 20 and 27, 2017.

**d. Defendant Failed to Deposit At Least $551,750 in AmTrust Proceeds into the Court Registry**

The Court finds that by the end of July 2018, Ms. Dostalik had in her possession at least $551,750 in AmTrust Proceeds and failed to deposit these funds into the Court registry, in violation of the October 4, 2017 Injunction.

On June 13, 2016, Ms. Dostalik invested $500,000 into Rich Uncles Real Estate Investment Trust ("REIT") with funds from Wells Fargo Personal Checking (9396). (See Pl. Exs. 15, 149; ECF No. 209 ("Tr. of OSC Hr'g on Dec. 20, 2018" or "Tr. Dec. 20, 2018"), 108:19-109:22.) During the OSC proceedings on December 20, 2018, Ms. Dostalik testified that the funds for this investment came from the $2.5 million she received in connection with the sale of PBIS to AmTrust:

Question [by Plaintiff's counsel]: You previously had an investment at Rich Uncles REIT, correct?

Answer [by Defendant]: Correct.

Q: What was that?
A: I'm sorry. Correct. Yes.
Q: And you had invested $500,000 in Rich Uncles REIT from the $2.5 million that you received, correct?
A: From the martial settlement, yes.

(Tr. Dec. 20, 2018, 108:19-109:1.) Plaintiff's counsel then asked Defendant to examine a record of the investment in one of Defendant's bank statements and again confirmed with Defendant that this money came from the $2.5 million in AmTrust funds:

Question [by Plaintiff's counsel]: And I'd like for you to turn to the fifth page, [of Plaintiff's Exhibit 15, a statement from June 1-30, 2016 for Wells Fargo Personal Checking (9396)] please. And about a third of the way down on, June 13th, 2016, there's a $500,000 withdrawal to Fund'em Rich Uncles Next Region. Is that when you invested $500,000 in Rich Uncles?
Answer [by Defendant]: Yes. In 2016, yes.
Q: And that came from the $2.5 million that you received, correct?
A: It came from my marital settlement, yes.

(Id. 109:15-22.)[4]

From April to July 2018, Ms. Dostalik received checks from Rich Uncles REIT made out to the Diane M. Dostalik Trust in the following amounts:

- $9375 on April 25, 2018 (check no. 5890)
- $266,500 on July 16, 2018 (check no. 519)
- $266,500 on July 16, 2018 (check no. 520)

---

[4] Ms. Dostalik emphasized that she received the $2.5 million during her divorce proceedings, which Plaintiff does not dispute. Notwithstanding this emphasis, it remains clear that the $2.5 million being discussed is Ms. Dostalik's share from the sale of PBIS to AmTrust. (See Pl. Exs. 42, 44.) Indeed, Defendant offered no proof that she received another sum of $2.5 million as part of her divorce proceedings unrelated to the sale of PBIS.

- $9,375 on July 25, 2018 (check no. 6405)

(Pl. Ex. 5.) The four checks together total $551,750, which Ms. Dostalik did not deposit into the Court registry.

Thus, the Court finds Ms. Dostalik in contempt for failing to deposit $551,750 in AmTrust proceeds into the Court registry, in violation of the October 4, 2017 Injunction Order.

**2. Defendant Continued to Violate the October 4, 2017 Injunction Order and Violated the August 8, 2018 TRO**

**a. August 8, 2018 TRO**

On August 8, 2018, the Court ordered that Ms. Dostalik is:

> [P]rohibited and enjoined from disbursing or transferring funds, or aiding, suffering or effecting the disbursement of funds, from any account established at *Caye International Bank*, without further order of this Court.

(August 8, 2018 TRO, ¶ 1) (emphasis added).

//

The Court also ordered that Ms. Dostalik is "enjoined from selling, assigning, transferring, liquidating or withdrawing any funds, shares, equity interests or proceeds in relation to any investment" "relating to" "Rich Uncles, LLC" or "bitcoin."[5] (Id. at ¶¶ 2-3.)

---

[5] Throughout Ms. Dostalik's testimony, when referencing her alleged cryptocurrency investments, she at times said "bitcoin," while at other times, she said "cryptocurrency." Her attorney clarified for the record that Ms. Dostalik had been using the terms interchangeably. Counsel asked her during the OSC proceeding, "Just to clarify some of your testimony, when you say that money went to bitcoin, were you generalizing the statement when you said, 'bitcoin,' or were you specifically meaning bitcoin when you sent the money?" (See ECF No. 277 ("Tr. of OSC Hr'g on May 21, 2019" or "Tr. May 21, 2019"), 63:8-11.) In response, Ms. Dostalik answered, "Generalization." (Id. at 63:14.) Thus, the Court understands that when Ms. Dostalik has testified as to her "bitcoin" investments, she was referring to cryptocurrency investments generally. Because the Court's August 8, 2018 TRO was issued in part based off of Ms. Dostalik's deposition testimony with respect to "bitcoin" investments, the Court clarifies that any reference to "bitcoin" investments in the August 8, 2018 TRO encompasses

Finally, the Court ordered that Ms. Dostalik must provide discovery, with respect to accounts and investments relating to Caye International Bank, Rich Uncles REIT, and bitcoin. (Id. at ¶¶ 4.1.1, 4.1.2, 4.1.3, 4.2.)

Again, the Court warned that "[a]ny violation of this Order may be treated as a civil or criminal contempt and may subject the violator to arrest and prosecution for such contempt." (Id. at ¶ 6.)

**b. Defendant Transferred and Disbursed Caye Bank Funds and Rich Uncles Proceeds**

Ms. Dostalik transferred and disbursed funds that had been withdrawn from her Caye Bank account and proceeds from her Rich Uncles investment on August 13, 2018 and September 4, 2018, in violation of the August 8, 2018 TRO.

From about April to August 2018, Ms. Dostalik was withdrawing funds from Caye 2015 Diane M. Dostalik Trust (3164). (See generally Pl. Ex. 140N.) Some of these withdrawals occurred in the form of wire transfers. (Pl. Exs. 140I, 140K, 140F.) Ms. Dostalik also withdrew money by requesting that the bank load her Caye Bank debit card, which occurred monthly from March to August 2018. (Pl. Exs. 140E, 140G, 140H, 140J, 140L, 140M.) In total, these wire transfers and debit card reloads amount to about $338,039. (Pl. Exs. 140I, 140K, 140F, 140E, 140G, 140H, 140J, 140L, 140M.) No documents were produced by either party to show how Ms. Dostalik used the funds on the Caye Bank debit card, but Defendant testified that all the money on the debit card was used to invest in cryptocurrency, with a few minor exceptions for personal expenses like paying "a phone bill" or using "some for gas." (Tr. May 20, 2019, 59:6-60:16.)

In June and July 2018, two of three wire transfers, in the amount of $260,000 were transferred to Ms. Dostalik's checking account at Citibank

---

cryptocurrency investments generally.

("Citibank Diane M. Dostalik Checking (8897)"). (Pl. Exs. 152A, 152C.) As discussed above in Part A(1)(d), Ms. Dostalik received three checks from Rich Uncles in July 2018. (Pl. Ex. 5 (check nos. 519, 520, 6405).) In total these checks amount to $542,375. (Id.) Ms. Dostalik deposited one check into Citibank Diane M. Dostalik Checking (8897) and the other two into her Citibank savings account ("Citibank Diane M. Dostalik Savings (8921)"). (Pl. Ex. 152C.) Thus, throughout June and July 2018, approximately $802,375 of money from Caye Bank and Rich Uncles proceeds was deposited into Ms. Dostalik's accounts at Citibank. (Pl. Exs. 152A, 152C.) During this time, no other major deposits were made. (Id.)

As Ms. Dostalik was transferring money into her Citibank accounts, she was also transferring money out to Gemini Trust Co, LLC ("Gemini"). (Id.) Between June and July 2018, Ms. Dostalik wired about $509,000 from Citibank to Gemini. (Id.) Ms. Dostalik testified that all money wired to Gemini was for the purpose of investing in cryptocurrency. (See Tr. May 20, 2019, 68; Tr. May 21, 2019, 31, 35-37.) All or substantially all this money came from Caye Bank or Rich Uncles. (Pl. Exs. 5, 140I, 140K, 140F, 140E, 140G, 140H, 140J, 140L, 140M, 152A, 152C.)

This sequence of transfers and deposits of funds consisting in large part of AmTrust proceeds was done in violation of the Court's October 4, 2017 Injunction Order.

In August and September 2018, Ms. Dostalik made two additional wire transfers from Citibank to Gemini. (Pl. Ex. 152D.) The first was initiated on August 13, 2018, in the amount of $50,000. (Id.) The second was on September 4, 2018, in the amount of $10,000. (Id.) Additionally, Ms. Dostalik requested a debit card reload from Caye Bank on August 7, 2018 for $9052. (Pl. Ex. 140M.) The balance of the Caye 2015 Diane M. Dostalik Trust (3164) reflects a $9052 reduction on August 8, 2018, demonstrating that on August 8, 2018, the day of

the Court's order, Ms. Dostalik had $9052 in Caye Bank funds on her debit card.

These last two wire transfers, as transfers of money in large part made up of AmTrust proceeds and comprised of disbursements of Caye Bank funds and Rich Uncles proceeds, were in violation of both the October 4, 2017 Injunction Order and the August 8, 2018 TRO. Ms. Dostalik testified that she used the $9052 on her debit card on August 8, 2018 to invest in cryptocurrency, (Tr. May 20, 2019, 59:6-60:16), which, as a disbursement of Caye Bank funds, also violated the August 8, 2018 TRO.

**c. Defendant Failed to Provide Documents and Information Related to Caye Bank, Rich Uncles, and Cryptocurrency Accounts and Investments**

Ms. Dostalik failed to produce documents and information with respect to Caye Bank, Rich Uncles, and cryptocurrency, in violation of the August 8, 2018 TRO.

As to Caye Bank, Ms. Dostalik was provided access to an online account when she opened the account in 2017. (Pl. Exs. 140A, 140B.) Defendant testified that she recorded her password for her account when filling out a debit reload request on August 7, the day before the Court's Order. (Pl. Ex. 140M; Tr. May 21, 2019 13:4-19.) However, she never disclosed that information to Plaintiff, in violation of the Court's Order. If Ms. Dostalik did manage to lose her password in the roughly 24-hour period between the debit reload request and the Court's Order, she failed to take reasonable steps to recover it. Ms. Dostalik also failed to take reasonable steps to request bank statements, if she in fact did not already have access to them. (Tr. May 21, 2019 13:20-23.) Ms. Dostalik also failed to produce email exchanges between herself and Caye Bank. (Pl. Exs. 140E, 140O.)

As to Rich Uncles, Ms. Dostalik failed to produce any information about the four checks she received from April to July 2018, even though three of those four

checks had just been received less than a month before the Court's Order. (Pl. Ex. 5.) Moreover, Ms. Dostalik failed to take reasonable steps to correct her deposition testimony in May 2018 that her Rich Uncles investment had been completely liquidated. (Pl. Ex. 155 ("Dep. Diane Dostalik, Vol. II"), 190:4-10; see also Tr. May 21, 2019, 32:9-34:10.) At the December 20 OSC hearing, Ms. Dostalik testified that the two Rich Uncles checks for $266,500 each were deposited into her Caye Bank account, after first being deposited into an intermediary bank, all descriptive details of which, including name and location, she was unable to recall. (Tr. Dec. 20, 2018, 126:8-12.)

As to any cryptocurrency investments, Ms. Dostalik has failed to produce anything whatsoever with respect to over $680,000 that she testified had been invested into cryptocurrency from June to September 2018. (Tr. May 21, 2019, 37:25-38:5.)

In fact, the only information provided by Ms. Dostalik as to the discovery order in the August 8, 2018 TRO is a letter on September 21, 2018 from Ms. Dostalik's counsel to Plaintiff's counsel. (See Pl. Ex. 21.)

As to Caye Bank, the letter asserts:

> Ms. [Dostalik] contends she testified the account was closed and there is no money in the account. Ms. [Dostalik] also contends she did not maintain the login information for the website, and she does not have the login information. She did not receive any documents from them other than the documents which were the subject of her deposition . . . .

(Id. at 1.) However, the record reflects that as of the date of this letter, Ms. Dostalik's Caye bank account was still open and contained about $40,000. (Pl. Ex. 140N.)

As to Rich Uncles:

> Ms. [Dostalik] contends the request to liquidate the account was made months before Ms. [Dostalik]'s deposition was taken. Ms. [Dostalik] does not have the login information anymore, she does not

Case 3:16-cv-03038-BTM-WVG Document 287 Filed 06/27/19 PageID.8623 Page 19 of 30

> recall the login information, and she did not receive any documents that might be produced.

(Id. at 2.) However, the record reflects that just two months prior, Ms. Dostalik had received over $533,000 from Rich Uncles. (Pl. Ex. 5.) Ms. Dostalik produced no documents or information to disclose this fact to Plaintiff.

As to any cryptocurrency investment:

> Ms. [Dostalik] contends she no longer has any cryptocurrency account, including Bitcoin. The "coins" were managed by a company called Shapeshift, and transferred into a cryptocurrency called Monero. The first week of August, there was a Mega Chrome Extension Hack (information available online and on news outlets), and Ms. [Dostalik]'s username and password were taken. She has no access to the account, and she does not know the status of any cryptocurrency funds.

(Id. at 3.) However, Ms. Dostalik produced no information or documents that she ever had an account at ShapeShift. If Ms. Dostalik's ShapeShift account was in fact hacked, there is no evidence, other than Ms. Dostalik's testimony. Ms. Dostalik also failed to produce any evidence that she took steps to recover her $680,000 investment, such as filing a police report or at the very minimum, contacting Shapeshift. Moreover, if Ms. Dostalik did lose account information as a result of a hack that she reported occurred in August 2018, then she must have managed to create a new or separate account for the purpose of the cryptocurrency investment that she testified occurred in September. She failed to disclose any information about a new or separate account.

Thus, in failing to produce any documents with respect to Caye Bank, Rich Uncles, and cryptocurrency investments, Ms. Dostalik violated the Court's August 8, 2018 TRO.

**3. Defendant Has Willfully Violated the Court's Orders**

While Plaintiff need not show willfulness, *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695, the Court nonetheless finds that Ms.

Dostalik acted willfully in violating the October 4, 2017 Injunction and the August 8, 2018 TRO. Substantial evidence demonstrates that Ms. Dostalik acted deceitfully and with little regard or respect for Court orders.

First, the Court finds that Ms. Dostalik understood that the $2.5 million sum she received during the course of her divorce proceedings was related to the sale of PBIS to AmTrust and was required to be deposited into the Court registry. Any testimony that she did not understand her obligations under the October 4, 2017 Injunction is inconsistent with her prior statements.

On October 5, 2017, Ms. Dostalik sent two emails reflecting that she understood the October 4, 2017 Injunction. The morning of October 5, Ms. Dostalik wrote, in an email to Suzanne Werden, that the Court's Order was "on PBIS, Cal Regent, MR. Nagby and myself. The court ordered I cannot transfer any assets. I'm supposed to register my assets with the court." (Pl. Ex. 1) (quoted as appears). Later that day, Ms. Dostalik sent another email to Suzanne Werden, stating, "[i]n a nutshell, Judge Prepared Order Granting [Plaintiff]'s Motion for Default Judgment and Motion for Preliminary Injunction for us to turn over all our assets to the court." (Id.) (quoted as appears). At this point, as Mr. Bergmark testified, the money accessible to Ms. Dostalik was 97% AmTrust proceeds, making up substantially all of her assets. (Tr. May 20, 2019, 42:24-43:12.) This explains why Ms. Dostalik stated that she was required to turn over "all" assets.

In another email just a few weeks later on October 23, 2017, Ms. Dostalik again demonstrated her understanding of the Injunction. Ms. Dostalik wrote, in another email to Suzanne Werden:

> I had a brain storm at 3:00 in morning last night, to see if [counsel] would do a motion for me with Judge Murphy to Correct or Modify the Divorce Judgement to say "Marital Settlement" from Property Settlement, as there is no spousal support for a 22-year marriage, and so there should be an update on the status of the divorce

judgment.

> [Mr. Nagby] can't have his cake and eat it, too. If he is not going to pay one cent of spousal support, then it should be corrected that *the money from AmTrust* is a martial settlement. Am I correct, that that would get me out of the AmTrust case?

(Pl. Ex. 155) (emphasis added).

Finally, there is some evidence to suggest that shortly after Ms. Dostalik received the $2.5 million in AmTrust proceeds in 2015, she understood that the funds could be subject to a money judgment. (Pl. Ex. 48.) In an email sent on October 30, 2015 to Barbara Hopper which included bank account information for the Nevada Cactus Growers LLC and Green Tree Funding LLC accounts, Ms. Dostalik explained:

> Because of two lawsuits against Cal-Regent, it was recommended to me that I open up these Nevada corporate accounts so that if the corporate veil was pierced and we were personally responsible, the money would be in these (2) Nevada corporations.

(Pl. Ex. 48.) At a minimum, this evidence demonstrates that Ms. Dostalik had a long-held understanding that the $2.5 million she received in 2015 was in connection with business transactions relating to Cal-Regent, PBIS, and AmTrust and that the money was subject to the Court's October 4, 2017 Injunction.

Second, Ms. Dostalik's repeated assertions that every action she took with respect to her personal finances was a result of advice from financial advisors are not corroborated by the evidence as a whole. In particular, Ms. Dostalik often explained her actions as a result of advice given from Ms. Suzanne Werden. Ms. Werden testified that she first met Ms. Dostalik in 2015 when Ms. Dostalik came to her seeking advice on her tax liability on the proceeds she received "when [PBIS] was sold," which "would have been her share of the business." (Tr. Jan. 29, 2019, 7:3-20.) But, in contrast with Ms. Dostalik's testimony, (see Tr. Dec. 20, 2018, 92:25-96:4), Ms. Werden testified that she did not manage any

of Ms. Dostalik's bank accounts or personal finances, nor did she ever check the balances of Ms. Dostalik's bank accounts. (See generally id. at 8-11; see also id. at 10:22-11:5.) Ms. Werden did not manage Ms. Dostalik's accounts or investments relating to Caye Bank, (Id. at 8:5-24.), Rich Uncles (Id. at 9:6-10:21), or cryptocurrency (Id. at 8:25-9:5). While Ms. Werden suggested that Ms. Dostalik should sell real estate in El Cajon, California, she was not personally involved in the steps Ms. Dostalik then took to try to sell it. (Id. at 11:6-18.) Finally, Ms. Werden testified that she has not been in contact with Ms. Dostalik since May 2018 (Id. at 11:19-22), in spite of Ms. Dostalik's testimony that Ms. Werden was still providing advice after this point. (See, e.g., Tr. May 21, 2019, 16:22-17:11 (reflecting Ms. Dostalik's testimony that in December 2018, Ms. Werden was still providing Ms. Dostalik advice on how to manage her financial accounts).) As discussed below in Part A(4), because the Court does not find Ms. Dostalik's self-serving testimony to be credible, the Court gives weight to Ms. Werden's testimony over Ms. Dostalik's, with respect to the nature and extent of their relationship.

Third, Ms. Dostalik took active steps to thwart Court orders. In spite of the August 8, 2018 TRO freezing her assets at Caye Bank, Ms. Dostalik sent two emails to Caye Bank in early December 2018 demanding that the remaining funds in her account be released. (Pl. Ex. 140P.) For example, on December 6, 2018, Ms. Dostalik wrote:

> Another request for the release of the funds in the 2015 Diane Dostalik Trust. You are illegally holding funds that have been requested to be released numerous times. Close the bank account and forward the check to the mailing address you have on file for the Trust. My attorney has indicated there is no court order against the Trust and you are in error. If I lose my house because you are refusing to close the account for the 2015 Trust I will have no choice but to seek legal recourse.

(Id.)

In addition, after the Court ordered Ms. Dostalik to sign a consent directive instructing Caye International Bank to comply with discovery requests, (see ECF No. 208, Ex. A), she sent Caye Bank an altered copy with the majority of the directive crossed out. (Pl. Ex. 140Q.) Even though the Court denied Ms. Dostalik's motion to include "under protest" with her signature, (see ECF No. 219 ("Tr. of OSC Hr'g on Jan. 3, 2019" or "Tr. Jan. 3, 2019"), 23-26), Ms. Dostalik hand wrote this language on the altered copy. (Pl. Ex. 140Q.) She also wrote: "Forced to sign under duress, under protest and without A jury trial, as Requested. Do Not Follow this. Court Order. I was forced to sign this against my will without a jury trial. You do not have my authorization to Release any Records or any Funds." (Id.) (quoted as appears).

Thus, testimony that Ms. Dostalik did not understand that the $2.5 million she received in 2015 was subject to the October 4, 2017 Injunction Order is not credible. Any testimony that Ms. Dostalik acted in good faith or was ignorant she was violating the Court's orders is not credible. Consequently, the Court finds that Ms. Dostalik's violations of Court orders were willful.

**4. Defendant's Self-Serving Testimony Is Not Credible**

Ms. Dostalik has demonstrated that she is an unreliable witness, and thus, the Court gives very little weight to her self-serving testimony. As demonstrated by the Court's discussion above, there are numerous inconsistencies throughout Ms. Dostalik's testimony. For example, in Ms. Dostalik's deposition in May 2018, she stated that her Rich Uncles investment had been completely liquidated. (Dep. Diane Dostalik, Vol. II, 190:4-10; see also Tr. May 21, 2019, 32:9-34:10.) However, the record reflects that in July 2018, Ms. Dostalik received over $533,000 in funds from the Rich Uncles investment. (Pl. Ex. 5.) If Ms. Dostalik had been confused or mistaken during her deposition, she made no effort to correct her deposition testimony.

There are also significant gaps in Ms. Dostalik's testimony. Ms. Dostalik

often testified that she could not recall when asked questions about big sums of money and actions taken recently. It is not credible, for example, that Ms. Dostalik could not remember any details whatsoever about the bank where she testified that she deposited the checks she received from Rich Uncles in July 2018 amounting to over $533,000. (Tr. Dec. 20, 2018, 126:8-12.) Either Ms. Dostalik truly could not remember what she did with over half a million dollars less than six months prior, which makes her a very unreliable witness, or, Ms. Dostalik was lying when she testified that she could not recall any details.

In addition, due to Ms. Dostalik's actions in violation of Court orders, the Court finds that Ms. Dostalik has little respect for the Court's authority. For example, after the Court enjoined Ms. Dostalik from transferring funds at Caye Bank, Ms. Dostalik attempted to coerce Caye Bank into permitting her to withdraw funds. (Pl. Ex. 140P.)

Finally, Ms. Dostalik's testimony throughout the OSC proceeding that she had no access to bank statements or documents with respect to her account at Caye Bank or her investments in Rich Uncles and cryptocurrency is not credible. The record reflects that between June and September 2018, Ms. Dostalik withdrew funds from Caye Bank and deposited checks from Rich Uncles in order to transfer about $680,000 into her account with Gemini. (Pl. Exs. 5, 140I, 140K, 140F, 140E, 140G, 140H, 140J, 140L, 140M, 152A, 152C, 152D; Tr. May 21, 2019, 37:25-38:5.) It is not credible that Ms. Dostalik was unable to access any of this documentation.

These examples, and others already discussed, demonstrate that Ms. Dostalik is not a credible witness and that the Court cannot rely on her self-serving testimony. Thus, the Court gives very little weight to evidence offered in the form of self-serving testimony by Ms. Dostalik.

**5. Defendant Failed to Demonstrate Inability to Comply**

Defendant has failed to meet her burden to demonstrate that she is

currently unable to comply with the Court's October 4, 2017 Injunction and August 8, 2018 TRO. During Defendant's presentation of the evidence, she testified with respect to her bank accounts at Chase, Bank of the West, Wells Fargo, and Citibank. (Def. Exs. 2, 3, 4, 5, 10; see also Tr. May 21, 2019, 468-479.) The balances of these accounts read $0, with the exception of the Citibank account, which has a balance of about $120. (Id.) However, this evidence is not sufficient to carry Defendant's burden to demonstrate inability to comply. Defendant "must show categorically and in detail why [s]he is unable to comply." *Affordable Media,* 179 F.3d at 1241.

The evidence reflects that between June and September 2018, Ms. Dostalik deposited over $680,000 into Gemini Trust LLC. (Tr. May 21, 2019, 37:25-38:5.) However, Defendant has presented no credible evidence that she no longer has access to these funds. Ms. Dostalik has merely stated that her cryptocurrency investments were hacked, but as discussed above, this self-serving testimony is not credible.

Ms. Dostalik has repeatedly represented to the Court that she is not able to comply with Court orders. On September 21, 2017, in opposition to her former attorney's motion to withdraw, Ms. Dostalik wrote in a letter to the Court that she had "no money left to hire a new attorney" and that she had "nothing left, after living on the [AmTrust proceeds] for three years, paying lawyers for nothing, and paying taxes." (ECF No. 59.) However, as discussed above in Part A(1)(b), the record reflects that Ms. Dostalik had at least $175,000 in her bank accounts at that time. She also had $500,000 invested in Rich Uncles that she testified she "pretended" she was unable to access in September 2017. (See Tr. May 21, 2019, 43:9-18, 44:1-5, 64:2-13.) Between July and September 2018, she also donated $45,000 to charities, gave $10,000 to her niece, and invested $12,932.50 in gold and silver. (See Pl. Ex. 152E; see also Tr. May 21, 2019, 38:17-42:7.) Thus, the Court does not find Ms. Dostalik credible when she has

testified that she is unable to comply with Court orders. (See, e.g., Tr. May, 21, 2019, 38:6-16.)

Thus, Defendant has failed to show categorically and in detail inability to comply.

**6. Remedies**

The Court holds by clear and convincing evidence that Ms. Dostalik is in contempt for violating the October 4, 2017 Injunction and the August 8, 2018 TRO. Ms. Dostalik violated the October 4, 2017 Injunction by:

- failing to deposit $176,263.13 in the Court registry on October 11, 2017;
- comingling and transfering AmTrust proceeds between October 2017 and September 2018; and
- failing to deposit $551,750 in the Court registry on July 25, 2018.

Ms. Dostalik violated the August 8, 2018 TRO by:

- transferring and disbursing Caye Bank funds and Rich Uncles proceeds on August 13, 2018 and September 4, 2018; and
- failing from August 8, 2018 onward to provide documents and information related to Caye Bank, Rich Uncles, and cryptocurrency accounts and investments.

A district court's contempt award is civil "if it coerces compliance with a court order or is a remedial sanction meant to compensate the complainant for actual losses." *Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013) (citing *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 829 (1994)). "The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." *Int'l Union, United Mine Workers of America*, 512 U.S. at 828 (internal quotations and citations omitted). In the

context of civil contempt, “the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus ‘carries the keys of his prison in his own pocket.’” *Id.* (internal quotations and citations omitted). Moreover, “[a] finding that a condemnor’s misconduct was willful strongly supports granting attorney’s fees and costs to the party prosecuting the contempt.” *New York State Nat’l Org. for Women v. Terry*, 159 F.3d 86, 96 (2d Cir. 1998); *see also Hutto v. Finney*, 437 U.S. 678, 691 (1978) (“[T]he award of attorney’s fees for bad faith [may] serve[] the same purpose as a remedial fine imposed for civil contempt.”).

The December 2018 OSC re Contempt warned Ms. Dostalik of the steps she may need to take to purge any finding of contempt, which included depositing into the Court’s registry the AmTrust proceeds available to her in October 4, 2017 and July 2018. The Court also warned that if found in contempt, Ms. Dostalik may be immediately committed to the custody of the U.S. Marshall, or assessed a daily fine until she purges the contempt. Finally, the Court put Ms. Dostalik on notice that upon a finding of contempt, the Court could order Ms. Dostalik to pay Plaintiff’s attorney’s fees and costs incurred.

The Court hereby orders that to purge the contempt, Ms. Dostalik must:

1. Deposit the sum of $136,333.17[6] in the Court registry.
2. Deposit the sum of $551,750 in the Court registry.
3. Provide any documents or substantive information, documented or undocumented, regarding the disposition of and access to any income, accounts, investments, or proceeds relating to Caye International Bank, Rich Uncles, LLC, and cryptocurrency.

Ms. Dostalik has fourteen days from the entry of this Order to purge the

---

[6] This is the amount that Ms. Dostalik had in her possession on October 4, 2017 ($176,263.13), minus the amount from Ms. Dostalik’s Caye Bank account that has already been deposited into the Court registry ($39,929.96), per the Court’s Order Compelling Transfer of Funds on January 4, 2019 (See ECF No. 207).

contempt, or she will be committed to the custody of the U.S. Marshal.

Finally, because there is ample evidence that Ms. Dostalik violated Court orders willfully, the Court awards Plaintiff attorney's fees. Plaintiff may file a motion for attorney's fees within fourteen days.

**B. Preliminary Injunctions**

Before the Court are also two temporary restraining orders, the August 8, 2018 TRO and the November 7, 2018 TRO. Those orders required Ms. Dostalik to show cause why preliminary injunctions should not issue having the same terms as the TROs.

"A preliminary injunction is an extraordinary and drastic remedy." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A plaintiff seeking a preliminary injunction or a temporary restraining order must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) where applicable, an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).

Alternatively, "serious questions going to the merits and a balance of hardships can support issuance of a preliminary junction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted). Due to the exigent nature of a preliminary injunction, a court may consider hearsay and other evidence that would otherwise be inadmissible at trial. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary

Case 3:16-cv-03038-BTM-WVG Document 287 Filed 06/27/19 PageID.8633 Page 29 of 30

injunction.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 921 (9th Cir. 2003)).

**1. August 8, 2018 TRO**

As discussed above, the August 8, 2018 TRO enjoined Ms. Dostalik from transferring or disbursing funds relating to Caye Bank, Rich Uncles, and her cryptocurrency investments. This TRO is an extension of the Court's October 4, 2017 Injunction, the purpose of which was to prevent the disposition of AmTrust proceeds. Thus, for the same reasons outlined in the Court's order granting the October 4, 2017 Injunction, (see ECF No. 68 ("Order Granting Default Judgment and Preliminary Injunction"), 11-17), the Court grants a preliminary injunction with the same terms as the August 8, 2018 TRO. Plaintiff has already established likelihood of succeeding on the merits, and it has shown it would suffer irreparable harm in the absence of preliminary relief. Moreover, the balance of equities now tip even further in Plaintiff's favor. The evidence demonstrates that between June and September 2018, Ms. Dostalik deposited over $680,000 into Gemini Trust LLC. (Tr. May 21, 2019, 37:25-38:5.) Defendant has testified that all of this money was deposited into cryptocurrency, an investment that was lost during a hack. However, because the Court finds that Ms. Dostalik is not credible, this testimony carries little weight. As discussed above, Ms. Dostalik has continually violated Court orders since October 4, 2017. Thus, there is a clear and substantial likelihood that Ms. Dostalik still has access to over $680,000. Thus, preliminary relief is warranted.

**2. November 7, 2018 TRO**

On November 7, 2018, the Court ordered that:

> In the event that the real property at 2201 Weld Blvd., El Cajon, CA, APN 386-652-33-00, is sold, the sales proceeds shall be paid to the registry of the United States District Court, Southern District of California after deducting:
>
> 1.1 Any unpaid real property taxes and assessments then due and

owing;

1.2 All sums secured by the existing first mortgage;
1.3 Brokerage commission; and
1.4 Prorations, escrow fees and closing costs.

(November 7, 2018 TRO, 2.) Like the October 4, 2017 Injunction and the August 8, 2018 TRO, the purpose of the November 7, 2018 TRO was to prevent Ms. Dostalik from transferring funds. As discussed above, the Court has already held that Plaintiff has established likelihood of success on the merits. Plaintiff would be irreparably harmed in the event that Defendant sells the property and transfers the proceeds. Again, the balance of equities tips strongly in Plaintiff's favor, because Defendant has already failed to deposit over $725,000 of AmTrust proceeds in the Court registry and has testified that she no longer has access to this money. Thus, the Court grants a preliminary injunction.

//

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court **holds Defendant Diane Dostalik in civil contempt of the Court and grants Plaintiff's motions for preliminary injunctions (ECF Nos. 172, 194, 199.)**

The parties shall appear before the Court on July 15, 2019 at 3 pm for a status conference as to any purging of the contempt. In the absence of purging of the contempt, Ms. Dostalik shall then and there surrender to the U.S. Marshal to be confined until she purges her contempt.

IT IS SO ORDERED.

Dated: June 27, 2019



Honorable Barry Ted Moskowitz
United States District Judge

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ODYSSEY REINSURANCE COMPANY,<br>a Connecticut corporation<br><br>Plaintiff<br>v.<br><br>RICHARD KEITH NAGBY, DIANE NAGBY a.k.a. DIANE DOSTALIK; in her individual capacity and as trustee of the 2015 Diane M. Dostalik Trust; PACIFIC BROKERS INSURANCE SERVICES, a Nevada corporation; CAL-REGENT INSURANCE SERVICES CORPORATION, a California corporation; CLAIMS TECHNOLOGY SERVICES CORPORATION, a California corporation; DAVID DOSTALIK; and AMTRUST NORTH AMERICA, INC., a Delaware corporation.<br><br>Defendants | Case No. 3:16-cv-03038-BTM-WVG<br><br>JUDGMENT ON SECOND AMENDED COMPLAINT OF PLAINTIFF ODYSSEY REINSURANCE COMPANY AS TO DEFENDANT DIANE DOSTALIK ONLY |

An Offer of Judgment under Federal Rule of Civil Procedure 68 having been made and accepted, and the proposed Judgment having been lodged and approved as to form by counsel for Plaintiff and for Ms. Dostalik, the Court enters the following Judgment as to defendant Diane Dostalik only:

1. The payment of $2,500,000.00 from Pacific Brokers Insurance ServicesCorporation ("PBIS") to Diane M. Dostalik, formally known as Diane Nagby (the "Avoided Distribution") is avoided under the California Uniform Fraudulent Transfer Act.

2. Plaintiff Odyssey Reinsurance Company shall recover from Defendant Diane M. Dostalik damages under the California Uniform Fraudulent Transfer Act in the total amount of $3,208,150.68 (consisting of the total of $2,500,00.00 plus $708,150.68 in pre-judgment interest at the rate of seven percent per cent per annum (7%) calculated from August 4, 2015).

3. Consistent with the Court's October 4, 2017 “Injunction Order” (Docket No. 69) and June 27, 2019 “Order Holding Diane Dostalik in Contempt and Granting Preliminary Injunctions” (Docket No. 287)(the “Contempt Order”):

3.1 Diane Dostalik, individually and in any other capacity, her agents, trusts, assigns, and all those acting her behalf, including Green Tree Funding, LLC, are permanently enjoined and restrained from directly or indirectly transferring, assigning, disposing of or commingling any of the Avoided Distribution, or funds or property representing the proceeds of the Avoided Distribution;

///

///

3.2 Upon sale of the real property at 2201 Weld Boulevard, City of El Cajon, County of San Diego, State of California, having APN 386-652-33-00, the sales proceeds shall be paid to the registry of the United States District Court, Southern District of California, after deducting:

3.2.1 Any unpaid real property taxes and assessments then due and owing;

3.2.2 All sums secured by the existing first mortgage;

3.2.3 Brokerage commission;

3.2.4 Prorations, escrow fees, and closing costs

the proceeds of which shall be held pending a determination by the Court as to what extent, if any, they should be applied to satisfaction of this Judgment.

3.3 Diane Dostalik shall deposit into the registry of this Court all funds representing the proceeds of the Avoided Distribution, where they shall be held pending a determination by the Court as to what extent, if any, they should be applied to satisfaction of this Judgment.

4. Except as otherwise ordered by the Court on Plaintiff Odyssey Reinsurance Company's motion for attorney fees filed July 11, 2019, each party shall bear their own attorney fees.

5. Except as otherwise ordered by the Court on Plaintiff Odyssey Reinsurance Company's motion for attorney fees filed July 11, 2019, and pursuant to Federal Rule of Civil Procedure 54(d)(1), Plaintiff Odyssey Reinsurance Company is entitled to recover costs in these proceedings, subject to taxation pursuant to 28 U.S.C. § 1920.

6. This Judgment is certified as final pursuant to Federal Rule of Civil Procedure 54(b), the Court finding that there is no just reason for delay, for the following reason among others: that delay in entering this Judgment may affect appellate jurisdiction over any appeal relating to the Contempt Order, under the holding in *Nat'l Abortion Fed'n v. Ctr. for Med. Progress,* 926 F.3d 534 (9th Cir. 2019).

DATE: August 28, 2019

Barry Ted Moskowitz
UNITED STATES DISTRICT JUDGE

APPROVED AS TO FORM:

RAMEY LITIGATION GROUP, APC

By: /s/ Christopher L. Ramey
Christopher L. Ramey
Attorneys for Defendant and Counterclaimant Diane Dostalik fka Diane Nagby

KIRBY & McGUINN, A P.C.

By: /s/ Dean T. Kirby, Jr.
Dean T. Kirby, Jr.
Attorneys for Plaintiff Odyssey Reinsurance Company

PLEASE COMPLETE THIS INFORMATION

RECORDING REQUESTED BY:
Vantage Point Title, Inc.

AND WHEN RECORDED MAIL TO:
Vantage Point Title, Inc.
25400 US Hwy 19 N, Ste 135
Clearwater, FL 33763
VPT File #: CA501067
VPC File #: VPC36556

DOC# 2019-0134614

Apr 15, 2019 01:34 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES: $202.00 (SB2 Atkins: $150.00)
PCOR: N/A
PAGES: 9

# MEMORANDUM OF UNISON HOMEOWNER AGREEMENT

(Please fill in document title(s) on this line)

BORROWER NAME: Diane M. Dostalik, Trustee of
The 2015 Diane M. Dostalik Trust

BORROWER ADDRESS: 2201 Weld Boulevard, El Cajon, CA 92020

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
(Additional recording fee applies)

CCR REC 31 Rev. 1/1/2018

**Prepared by, recording requested by, and when recorded mail to:**

Unison Agreement Corp.
P.O. Box 26800
San Francisco, CA 94126-6800

Unison HomeOwner Agreement ID Number:
FRX-143648

# MEMORANDUM OF UNISON HOMEOWNER AGREEMENT

This **MEMORANDUM OF UNISON HOMEOWNER AGREEMENT** ("**Unison HomeOwner Recorded Memorandum**") is entered into as of 04/02/2019 ("**Effective Date**") by and between DIANE M DOSTALIK , TRUSTEE OF THE 2015 DIANE M. DOSTALIK TRUST (individually or collectively "**Owner**") and Unison Agreement Corp., a Delaware corporation, and its successors and assignees ("**Benefited Party**"), whose address is 650 California Street, Suite 1800, San Francisco, CA 94108.

## MEMORANDUM OF UNISON HOMEOWNER AGREEMENT

Owner hereby declares that Owner has entered into that certain Unison HomeOwner Agreement ("**Unison HomeOwner Agreement**") with Benefited Party, as of the Effective Date, pursuant to which Owner grants and conveys to Benefited Party the option to purchase an undivided percentage interest in that certain real property (the "**Property**") described in attached **SCHEDULE A** ("**Option**") and pursuant to which Owner has made certain covenants and promises to, or for the benefit of, Benefited Party in connection with the Property, all as more particularly described and on the terms and conditions stated in the Unison HomeOwner Agreement. The percentage interest shall equal the Investor Percentage as specified in the Unison HomeOwner Option Agreement. The Option is irrevocable by Owner. The term of the Option shall commence on the Effective Date and shall expire at 11:59 p.m., Pacific Time, on the day immediately preceding the thirtieth (30th) anniversary of the Effective Date ("**Expiration Date**") (subject to certain extensions as set forth in the Unison HomeOwner Agreement). The terms of the Unison HomeOwner Agreement are hereby incorporated into this Unison HomeOwner Recorded Memorandum by this reference.

## MEMORANDUM OF COVENANTS RUNNING WITH THE LAND

This Unison HomeOwner Recorded Memorandum identifies the covenants and promises set forth in the Unison HomeOwner Agreement that run with the land and will be binding upon any party who acquires Owner's interest in the Property so long as the Unison HomeOwner Agreement has not expired or been terminated. The Unison HomeOwner Agreement covenants are deemed to be covenants running with the land within the meaning of Section 1460 of the California Civil Code so as to give it the broadest possible application, and include, without limitation:



© 2018, **Unison**

a. **Section 8.2** of the Unison HomeOwner Covenant Agreement which, among other things, requires Owner to maintain and repair the Property and to ensure that use of the Property complies with all applicable state, federal and local laws and regulations.

b. **Section 8.16** of the Unison HomeOwner Covenant Agreement which, among other things, requires Owner to maintain insurance on the Property against certain hazards.

c. **Section 8.10** of the Unison HomeOwner Covenant Agreement which, among other things, requires Owner to pay all taxes and assessments accruing on the Property.

d. **Section 8.8** of the Unison HomeOwner Covenant Agreement which, among other things, requires Owner to occupy the Property as Owner's principal residence and prohibits use of the Property for commercial or other non-residential purposes.

e. **Section 8.9** of the Unison HomeOwner Covenant Agreement which, among other things, restricts the ability of Owner to increase the amount of debt to third parties secured by liens on the Property beyond the Maximum Authorized Debt specified in the Unison HomeOwner Agreement, and requires Owner to keep the Property free of liens prohibited under the terms of the Unison HomeOwner Agreement or not otherwise approved by Benefited Party.

f. **Article Three** of the Unison HomeOwner Covenant Agreement which, among other things, restricts the right of Owner to transfer the Property other than as expressly permitted under the terms of the Unison HomeOwner Agreement.

[This space is intentionally left blank.]

RELEASE

This Unison HomeOwner Recorded Memorandum shall remain in full force and effect until released by a written termination or quitclaim deed executed and notarized by Benefited Party and recorded in the real property records for the county where the Property is located, or until extinguished by operation of law.

[Signatures appear on the following page.]



© 2018, Unison

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFITED PARTY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PROGRAM GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS UNISON HOMEOWNER RECORDED MEMORANDUM, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFITED PARTY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned Benefited Party and Owner have each executed this Unison HomeOwner Recorded Memorandum as of the date set forth above.

**BENEFITED PARTY:**

Unison Agreement Corp., a Delaware corporation

By: [signature]

Name: Daniel Eisenberg

Title: Vice President

Date signed: 4/13/2019

**OWNER:**

By: Signed In Counterpart
Diane M Dostalik

Date signed: __________

By: __________

Date signed: __________

By: Signed In Counterpart
DIANE M DOSTALIK; TRUSTEE OF THE 2015 DIANE M. DOSTALIK TRUST

Date signed: __________

By: __________

Date signed: __________

**Property Address:**

2201 Weld Blvd
El Cajon, CA 92020



© 2018, Unison

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFITED PARTY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PROGRAM GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS UNISON HOMEOWNER RECORDED MEMORANDUM, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFITED PARTY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned Benefited Party and Owner have each executed this Unison HomeOwner Recorded Memorandum as of the date set forth above.

**BENEFITED PARTY:**

Unison Agreement Corp., a Delaware corporation

By: Signed In Counterpart

Name: Daniel Eisenberg

Title: Vice President

Date signed: ____________________

**OWNER:**

By: Diane M. Dostalik
Diane M Dostalik

Date signed: 4-2-2019

By: Diane M. Dostalik, Trustee
DIANE M DOSTALIK, TRUSTEE OF THE 2015 DIANE M. DOSTALIK TRUST

Date signed: 4-2-2019

By: ____________________

Date signed: ____________________

By: ____________________

Date signed: ____________________

**Property Address:**

2201 Weld Blvd

El Cajon, CA 92020



© 2018, Unison

**BENEFITED PARTY'S ACKNOWLEDGMENT**

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF CALIFORNIA)
) ss.
COUNTY OF SAN FRANCISCO)

On APR 0 3 2019, ~~20~~ 19, before me Penny Mae Juco, Notary Public, personally appeared Daniel Eisenberg who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _______________ (seal)
Penny Mae Juco

PENNY MAE JUCO
Notary Public - California
San Francisco County
Commission # 2213555
My Comm. Expires Sep 10, 2021

© 2018, Unison

# OWNERS' ACKNOWLEDGMENT

**[Notary Acknowledgment(s) must be attached.]**

SEE "ATTACHED"



© 2018, **Unison**

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Diego )

On April 2 2019 before me, Matt Miller Notary Public
(insert name and title of the officer)

personally appeared Diane M Do Stalik,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

MATT MILLER
Notary Public - California
San Diego County
Commission # 2278031
My Comm. Expires Feb 26, 2023

WITNESS my hand and official seal.

Signature ______________ **(Seal)**
Matt Miller

Page 7

## SCHEDULE A

## LEGAL DESCRIPTION

That certain real property situated in the City of El Cajon, County of SAN DIEGO, State of California, described as follows:

The land referred to herein below is situated in the City of El Cajon, County of San Diego, State of California and is described as follows

PARCEL A:
Parcel 1 of Parcel Map 15870, in the City of El Cajon, County of San Diego, State of California, according to Map thereof filed in the Office of the County Recorder of San Diego County, November 13, 1989.

PARCEL B:
An easement for driveway purposes over that portion of Parcel 2 of Parcel Map 15870, filed in the Office of the County Recorder of San Diego County, November 13, 1989 lying within the boundaries of that portion thereof as delineated and designated as limits of a joint-use driveway easement for ingress and egress for the benefit
of each parcel.

Said easement is appurtenant to and for the benefit of or any portion of the above described Parcel a.

APN/Tax ID Number/Parcel Identification Number: 386-652-33-00

[end of legal description]



© 2018, Unison

PLEASE COMPLETE THIS INFORMATION

RECORDING REQUESTED BY:
Vantage Point Title, Inc.

AND WHEN RECORDED MAIL TO:
Vantage Point Title, Inc.
25400 US Hwy 19 N, Ste 135
Clearwater, FL 33763
VPT File #: CA501067
VPC File #: VPC36556

DOC# 2019-0134615
Apr 15, 2019 01:34 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES: $154.00 (SB2 Atkins: $75.00)
PCOR: N/A
PAGES: 17

## UNISON HOMEOWNER DEED OF TRUST AND SECURITY AGREEMENT

(Please fill in document title(s) on this line)

The document to which this page is affixed and made a part of is exempt from the fee imposed by the Building Homes & Jobs Act (SB 2-2017) (GC 27388.1)

Reason for exemption:

- ☐ Not related to real property - GC 27388.1 (a) (1)
- ☐ Recorded concurrently "in connection with" a transfer subject to the imposition of Documentary Transfer Tax - GC 27388.1 (a) (2)
- ☐ Transfer of real property that is a residential dwelling to an owner-occupier *or* recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier - GC 27388.1 (a) (2)
- ☑ Maximum $225.00 fee per transaction reached (presented concurrently and are related to the same parties and same property) - GC 27388.1 (a) (1)

BORROWER NAME: Diane M. Dostalik, Trustee of
The 2015 Diane M. Dostalik Trust

BORROWER ADDRESS: 2201 Weld Boulevard, El Cajon, CA 92020

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
(Additional recording fee applies)

CCR REC 31 Rev. 1/1/2018

**Prepared by, recording requested by, and when recorded mail to:**

Unison Agreement Corp.
P.O. Box 26800
San Francisco, CA 94126-6800

Unison HomeOwner Agreement ID Number:
FRX-143648 CA501067

**UNISON HOMEOWNER DEED OF TRUST AND SECURITY AGREEMENT**

**NOTICE: THIS DEED OF TRUST CONTAINS A SUBORDINATION CLAUSE WHICH MAY RESULT IN BENEFICIARY'S SECURITY OR OTHER INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

This **SUBORDINATED HOMEOWNER DEED OF TRUST AND SECURITY AGREEMENT,** together with riders hereto ("**Unison HomeOwner Security Instrument**"), is made as of 04/02/2019 "**Effective Date**"), among DIANE M DOSTALIK , TRUSTEE OF THE 2015 DIANE M. DOSTALIK TRUST (individually or collectively "**Trustor**"), and American Title Inc ("**Trustee**"), whose address is 11010 Burdette St PO BOX 641010, Omaha, NE 68164-1010 and Unison Agreement Corp., a Delaware corporation, and its successors and assignees ("**Beneficiary**"), whose address is 650 California Street, Suite 1800, San Francisco, CA 94108. Capitalized terms used in this Unison HomeOwner Security Instrument shall have the meanings specified in this Unison HomeOwner Security Instrument, or if not defined herein, in that certain Unison HomeOwner Covenant Agreement ("**Unison HomeOwner Covenant Agreement**"), Unison HomeOwner Option Agreement ("**Unison HomeOwner Option Agreement**") and that certain Memorandum Of Unison HomeOwner Agreement ("**Unison HomeOwner Recorded Memorandum**"), which documents, together with this Unison HomeOwner Security Instrument, are collectively termed the "**Unison HomeOwner Agreement**" executed by Trustor and Beneficiary concurrently herewith.

**1. Grant In Trust.**

TRUSTOR HEREBY IRREVOCABLY grants, transfers and assigns to Trustee, and its successors and assignees, in trust, with power of sale, all of that property ("**Real Property**") described in **SCHEDULE A** attached hereto and made a part hereof.

Together with all improvements, replacements and additions now or hereafter erected on the Real Property and all easements, appurtenances and fixtures now or hereafter a part of the Real Property. (The fixtures, improvements and the Real Property are collectively referred to as the "**Property**.")



Owner's Initials: D.D. / / /

© 2017, **Unison**

Together with all rents, issues, profits and proceeds, including without limitation insurance and condemnation proceeds, from the Real Property, subject, however, to the right, power and authority given to and conferred upon Beneficiary below to collect and apply such rents, issues and profits.

Trustor warrants that he/she/they is/are lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Trustor warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**2.** **<u>Secured Obligations</u>.** Trustor makes the grant, transfer and assignment set forth in the "Grant In Trust" Section above for the purpose of securing:

**a.** Trustor's performance, and Beneficiary's rights, under the Unison HomeOwner Agreement;

**b.** the performance and payment of the obligations of Trustor under the Unison HomeOwner Agreement, including:

**(i)** payment of all **Protective Advances**, including any unpaid interest and other fees and charges associated with such Protective Advances, owed to Beneficiary under the Unison HomeOwner Agreement;

**(ii)** payment of all **Asset Administration Fees** incurred by or owed to Beneficiary under the Unison HomeOwner Agreement;

**(iii)** payment of all insurance proceeds owed to Beneficiary pursuant to **Sections 8.16(e) and (f)** of the Unison HomeOwner Covenant Agreement;

**(iv)** payment of all condemnation proceeds owed to Beneficiary pursuant to **Section 8.17** of the Unison HomeOwner Covenant Agreement;

**(v)** performance of those obligations to Beneficiary specified in the Unison HomeOwner Agreement pursuant to **Articles Three, Four, Five, Eight and Nine** of the Unison HomeOwner Covenant Agreement, including, without limitation, payment of the Investor Interest under the Unison HomeOwner Agreement; and

**(vi)** performance of the obligations of Trustor under the Unison HomeOwner Covenant Agreement regarding Beneficiary's right as a co-owner to sell the Property following exercise of the **Option** and during **Orderly Sale**.

**c.** the performance of the obligations of Trustor contained in this Unison HomeOwner Security Instrument or incorporated by reference;



Owner's Initials: D.D. / ______ / ______ / ______

© 2017, **Unison**

**d.** any expenditures made by Beneficiary pursuant to, or under, this Unison HomeOwner Security Instrument; and

**e.** payment of all fees and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel (collectively "**Attorneys' Fees**")) incurred by Beneficiary in the enforcement and collection of the obligations listed above and the protection of Beneficiary's rights related thereto, whether such fees are incurred in any state, federal, appellate, or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Attorneys' Fees shall include, Attorneys' Fees incurred in any state, federal, appellate, or bankruptcy court, and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Unison HomeOwner Security Instrument, to the interpretation or enforcement of the parties' rights under this Unison HomeOwner Security Instrument, or to the Property.

The foregoing obligations are referred to collectively as the "**Obligations.**"

**f.** Trustor shall not be obligated to repay any part of the **Unison Investment Payment** (as such term is defined in Schedule A to the Unison HomeOwner Covenant Agreement); and therefore, such item shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payment calculated and agreed by Trustor to be paid pursuant to the Unison HomeOwner Agreement, according to the calculation of **Investor Proceeds** and **Investor Interest** (as defined in the Unison HomeOwner Agreement), including, without limitation, any such calculation in connection with a **Special Termination** as defined in **Section 6.2** of the Unison HomeOwner Covenant Agreement.

**3. Uniform Commercial Code Security Agreement And Fixture Filing.** This Unison HomeOwner Security Instrument also is intended to be and shall constitute a security agreement under the California Uniform Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the California Uniform Commercial Code. Trustor hereby grants to Beneficiary a security interest in those items to secure the performance and payment of the Obligations.

**a.** Trustor agrees that Beneficiary may file either this Unison HomeOwner Security Instrument, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index and/or in the Office of the Secretary of State of the State of California, as a financing statement for any of the items specified above as part of the Property.

**b.** This Unison HomeOwner Security Instrument constitutes a financing statement filed as a fixture filing pursuant to Sections 9502(c) and 9514 of the California Uniform Commercial Code, and any similar or successor provisions.

**c.** Beneficiary may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

**d.** Trustor shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Beneficiary may reasonably require.

**e.** On any default hereunder, Beneficiary shall have the remedies of a secured party under the California Uniform Commercial Code and may also invoke the remedies in **Section 7** below. In exercising any of these remedies, Beneficiary may proceed against the items of Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Beneficiary's remedies under the California Uniform Commercial Code or the remedies in **Section 7** below.

**4.** **Assignment Of Leases And Rents.** As additional security for the Obligations, Trustor hereby irrevocably, absolutely and unconditionally assigns to Beneficiary all of Trustor's right, title and interest in and to all existing and future leases, subleases and licenses relating to the use, occupancy or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds and earnings now or hereafter payable with respect to the ownership, use or occupancy of the Property (collectively the "**Rents**"):

**a.** Trustor hereby gives to, and confers upon, Beneficiary the right, power and authority, during the continuance of this Unison HomeOwner Security Instrument, to collect the Rents, reserving unto Trustor the right, prior to any default by Trustor in payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

**b.** Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations secured hereby, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Beneficiary may determine.

**c.** The entering upon and taking possession of the Property, the collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this Unison HomeOwner Security Instrument, shall not cure or waive any default or notice of default under this Unison HomeOwner Security Instrument or invalidate any act done pursuant to such notice.

**d.** Nothing in this section shall permit Trustor to lease or rent the Property in contravention of any provision of the Unison HomeOwner Agreement; nor shall anything in this section modify any provision in the Unison HomeOwner Agreement relating to the use, lease or occupancy of the Property.



Owner's Initials: D.D. /______/______/______

© 2017, **Unison**

5. **Covenants Of Trustor Regarding The Property**. Trustor hereby agrees as follows:

**a.** To appear in and defend any action or proceeding purporting to affect the security of this Unison HomeOwner Security Instrument or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses of Trustee and Beneficiary (including cost of evidence of title and Attorneys' Fees) incurred: **(i)** in any state, federal, appellate, or bankruptcy court, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Unison HomeOwner Security Instrument or to collect the Obligations or to protect Beneficiary's rights under this Unison HomeOwner Security Instrument; and/or **(ii)** in connection with the enforcement of any provisions of this Unison HomeOwner Security Instrument or in connection with foreclosure upon the collateral granted under this Unison HomeOwner Security Instrument (whether or not suit is filed).

**b.** To pay: at least ten (10) days before delinquency all taxes and assessments affecting the Property; and all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Unison HomeOwner Security Instrument, and all costs, fees and expenses of this Unison HomeOwner Security Instrument.

**(i)** If Trustor fails to make any payment or to do any act as provided in this Unison HomeOwner Security Instrument, Beneficiary or Trustee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Beneficiary or Trustee to protect the security for this Unison HomeOwner Security Instrument, which payments and related expenses (including Attorneys' Fees) shall also be secured by this Unison HomeOwner Security Instrument.

**(ii)** Such performance by Beneficiary or Trustee shall not require notice to, or demand on, Trustor and shall not release Trustor from any obligation under this Unison HomeOwner Security Instrument.

**(iii)** Beneficiary or Trustee shall have the following related rights and powers: **(A)** to enter upon the Property for the foregoing purposes, **(B)** to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Beneficiary or Trustee under this Unison HomeOwner Security Instrument, **(C)** to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Beneficiary or Trustee appears to be prior or superior to this Unison HomeOwner Security Instrument, and **(D)** to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

**c.** To pay immediately upon demand all sums expended by Beneficiary or Trustee pursuant to this Unison HomeOwner Security Instrument; and to pay interest on any of the foregoing amounts demanded by Beneficiary or Trustee at the rate specified in Section 3289



© 2017, **Unison**

of the California Civil Code (or other applicable law) from the date of such demand, not to exceed the maximum rate allowed by law at the time of such demand.

6. **Power Of Attorney.** Trustor hereby irrevocably appoints Beneficiary as Trustor's attorney-in-fact (such agency being coupled with an interest), and as such attorney-in-fact Beneficiary may, after providing notice to Trustor pursuant to the Unison HomeOwner Agreement and the Unison HomeOwner Recorded Memorandum, without the obligation to do so, in Beneficiary's name, or in the name of Trustor, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Beneficiary's security interests and rights in or to any of the Property, and, upon a default under this Unison HomeOwner Security Instrument, take any other action required of Trustor; provided, however, that Beneficiary as such attorney-in-fact shall be accountable only for such funds as are actually received by Beneficiary.

7. **Default And Foreclosure And Power Of Sale.** Upon default by Trustor in the performance of or upon breach by Trustor of any of the rights and Obligations that are secured by this Unison HomeOwner Security Instrument as specified above, Beneficiary may declare all performance and sums secured by this Unison HomeOwner Security Instrument immediately due by delivery to Trustee and to Trustor of written declaration of default. Beneficiary shall give notice of default to Trustor prior to acceleration following Trustor's breach of any covenant or agreement in this Unison HomeOwner Security Instrument. The notice shall specify: **(a)** the default; **(b)** the action required to cure the default; **(c)** a date, not less than 30 days from the date the notice is given to Trustor, by which the default must be cured; and **(d)** that failure to cure the default on or before the date specified in the notice may result in acceleration of the performance secured by this Unison HomeOwner Security Instrument and sale of the Property. The notice shall further inform Trustor of the right to cure after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Trustor to acceleration and sale. If the default is not cured on or before the date specified in the notice, Beneficiary at its option may require immediate performance in full of all obligations secured by this Unison HomeOwner Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Beneficiary shall be entitled to collect all expenses incurred in pursuing the remedies provided herein, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Beneficiary invokes the power of sale, Beneficiary shall execute or cause Trustee to execute a written notice of Beneficiary's election to cause the Property to be sold as prescribed by applicable law. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Beneficiary or Trustee shall mail copies of the notice as prescribed by applicable law to Trustor and to the other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. Beneficiary also shall deposit with Trustee this Unison HomeOwner Security Instrument, the Unison HomeOwner Agreement, and all documents evidencing any expenditures and damages secured by this Unison HomeOwner Security Instrument.



Owner's Initials: D.D. /______/______/______

© 2017, **Unison**

After the time required by applicable law, Trustee, without demand on Trustor, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.

Trustee shall deliver to the purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of their truthfulness. Any person, including Trustor, Trustee, or Beneficiary as defined in this Unison HomeOwner Security Instrument, may purchase at such sale.

**a.** After deducting all costs, fees and expenses (including Attorneys' Fees) of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: to Beneficiary, all sums expended and performance due under the terms of this Unison HomeOwner Security Instrument, not then performed or repaid, with accrued interest, if any, at the amount allowed by law in effect on the Effective Date of this Unison HomeOwner Security Instrument; to Beneficiary, all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

**b.** Notice provided to Trustor under this Unison HomeOwner Security Instrument shall be to the address specified in this Unison HomeOwner Security Instrument unless otherwise required by applicable law.

**c.** Exercise of Beneficiary's remedies under this Unison HomeOwner Security Agreement shall be in compliance with applicable law.

**8.** **Liquidated Damages**. Liquidated Damages means an amount equal to the sum of:

**a.** the **Investor Proceeds**, as calculated according to **Article 10 ("Calculations")** of the Unison HomeOwner Covenant Agreement;

**b.** in connection with Owner's failure to make any monetary payment, the sum of all monetary obligations (including, without limitation, all **Unpaid Owner Obligations**) owed to Investor by Owner under the Unison HomeOwner Agreement; and

**c.** any and all amounts, properly chargeable to Owner as necessary to satisfy Owner's obligations under the Unison HomeOwner Agreement with respect to Owner's mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other penalties.

**9.** **Late Performance**. By accepting performance of any obligation after its due date, Beneficiary does not waive its right either to require prompt performance when due of all other obligations or to declare default for such failure to perform.



© 2017, Unison

10. **Trustee's Powers**. At any time or from time to time, without liability therefor upon written request of Beneficiary and presentation of this Unison HomeOwner Security Instrument, and without affecting the personal liability of any person for the performance of the Unison HomeOwner Agreement secured hereby, Trustee may: **(a)** reconvey any part of the Property; **(b)** consent to the making of any map or plat of the Property; **(c)** join in granting any easement thereon; and **(d)** join in any extension agreement or any agreement subordinating the lien or charge of this Unison HomeOwner Security Instrument.

11. **Substitution of Trustee**. Beneficiary, or any successor in ownership of the Obligations, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named or acting under this Unison HomeOwner Security Instrument, which instrument, when executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where the Property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from Trustee's predecessor, succeed to all its title, estate, rights, powers and duties. Such instrument must contain the name of the original Trustor, Trustee and Beneficiary under this Unison HomeOwner Security Instrument, the book and page where this Unison HomeOwner Security Instrument is recorded, and the name and address of the new Trustee(s).

12. **Trustee's Compensation**. Trustor shall pay Trustee's fees and reimburse Trustee for expenses in the administration of this Trust, including Attorneys' Fees. Trustor shall pay to Beneficiary reasonable compensation for services rendered concerning this Unison HomeOwner Security Instrument, including without limitation any statement of amounts owing under any obligations.

13. **Full Reconveyance**. Upon written request of Beneficiary stating that all obligations have been performed or paid, and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held under this Unison HomeOwner Security Instrument. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such recitals. The grantee in such reconveyance may be described as "**the person or persons legally entitled thereto**."

14. **Subordination**. This Unison HomeOwner Security Instrument is subordinate to and junior to the Unison HomeOwner Recorded Memorandum which affects the Property and which is executed by Trustor as "**Owner**" as of the same date as this Unison HomeOwner Security Instrument. Upon any foreclosure of this Unison HomeOwner Security Instrument by the Beneficiary, despite such foreclosure, the Unison HomeOwner Recorded Memorandum will remain in full force and effect (until released pursuant to its terms) and binding upon any person who now or hereafter obtains an interest in the Property; and the Unison HomeOwner Agreement will remain in full force and effect and binding upon Trustor, and any other person who may agree to be bound by such documents.

15. **Successors**. This Unison HomeOwner Security Instrument applies to, inures to the benefit of, and binds all parties to this Unison HomeOwner Security Instrument, their heirs,



Owner's Initials: [initials] /______/______/______

© 2017, **Unison**

legatees, devisees, administrators, executors, successors, and assignees. The term "**Beneficiary**" shall include any successor or assignee of Beneficiary's rights in the Unison HomeOwner Agreement and in this Unison HomeOwner Security Instrument, whether or not named as Beneficiary in this Unison HomeOwner Security Instrument. In this Unison HomeOwner Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

**16. Joint and Several Liability.** If more than one person signs this Unison HomeOwner Security Instrument as Trustor, the obligations of each signatory shall be joint and several.

**17. Multiple Owners.** If there are multiple Trustors of the Property:

**a.** this Unison HomeOwner Security Instrument must be signed by each such Trustor;

**b.** all rights and powers specified for Trustor in this Unison HomeOwner Security Instrument must be approved and exercised unanimously by all such multiple Trustors;

**c.** all such multiple Trustors shall be jointly and severally liable for all liabilities and obligations specified for Trustor under this Unison HomeOwner Security Instrument;

**d.** notice required to be given by, or to, Trustor will be deemed adequately given if given by, or to, any of Trustors using the contact information set forth in this Unison HomeOwner Security Instrument; and

**e.** Beneficiary may treat any notice received from any one Trustor as notice from all Trustors.

**18. Revocable Trust.** If any Trustor is/are the trustee(s) of a **Revocable Trust** (as defined in Schedule A to the Unison HomeOwner Covenant Agreement):

**a.** all trustees and all trustors of the Revocable Trust must sign this Unison HomeOwner Security Instrument in their capacities as individuals and as trustees and/or trustors of the Revocable Trust, and each trustee and trustor of the Revocable Trust who signs this Unison HomeOwner Security Instrument hereby represents and warrants that all trustees and trustors of the Revocable Trust have been disclosed to Beneficiary;

**b.** any trustee of the Revocable Trust who is also a trustor of the Revocable Trust need only sign this Unison HomeOwner Security Instrument once for it to be binding on such person both as trustee and as trustor of the Revocable Trust;



© 2017, **Unison**

**c.** all rights and powers specified for, and all actions required of, Trustor in this Unison HomeOwner Security Instrument must be approved and exercised unanimously by all trustees of the Revocable Trust;

**d.** all trustees and all trustors of the Revocable Trust, in their capacities as individuals, shall be jointly and severally liable with Trustor for all liabilities and obligations specified for Trustor under this Unison HomeOwner Security Instrument;

**e.** all representations and warranties by Trustor in this Unison HomeOwner Security Instrument are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all trustees and all trustors of the Revocable Trust in their capacities as individuals;

**f.** notice required to be given by, or to, any Trustor will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in this Unison HomeOwner Security Instrument; and

**g.** Beneficiary may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Trustor.

**19. Acceptance by Trustee.** Trustee accepts this Trust when this Unison HomeOwner Security Instrument, duly executed and acknowledged, is made a public record as provided by law.

**20. Incorporation by Reference.** **SCHEDULE A** to this Unison HomeOwner Security Instrument is hereby incorporated by this reference.

**21. Extent of Lien.** The lien granted under this Unison HomeOwner Security Instrument shall encumber Trustor's entire interest in the Property, notwithstanding the fact that the Unison HomeOwner Agreement relates to only a fractional interest in the Property.

**22. No Merger.** So long as any of the obligations under the Unison HomeOwner Agreement remains outstanding and undischarged, unless Beneficiary otherwise consents in writing, the fee estate of Trustor in the Property or any part thereof (including the estate of Beneficiary after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Beneficiary or in any other Person.

**Do not lose or destroy this Unison HomeOwner Security Instrument or the Unison HomeOwner Agreement that it secures. All must be delivered to Trustee for cancellation before reconveyance will be made.**

[Signatures appear on the following page.]



Owner's Initials: D.D./______/______/______

© 2017, Unison

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFICIARY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PROGRAM GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS UNISON HOMEOWNER SECURITY INSTRUMENT, THE UNISON HOMEOWNER AGREEMENT AND TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFICIARY AS OF THE EFFECTIVE DATE.

The undersigned Trustor requests that a copy of any Notice of Default and any Notice of Sale under this Unison HomeOwner Security Instrument be mailed to Trustor at the address set forth below.

IN WITNESS WHEREOF, each undersigned Trustor has executed this Unison HomeOwner Security Instrument as of the date set forth above.

Trustor Address:

2201 Weld Blvd
El Cajon, CA 92020

By: Diane M. Dostalik
Diane M Dostalik

4-2-2019
Date Signed

By: ______________________

______________________
Date Signed

By: Diane M. Dostalik, Trustee
DIANE M DOSTALIK; TRUSTEE OF THE 2015 DIANE M. DOSTALIK TRUST

4-2-2019
Date Signed

By: ______________________

______________________
Date Signed



© 2017, **Unison** 

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA)
) ss.
COUNTY OF San Diego )

On April 2, 2019, before me Matt Miller Notary Public, Notary Public, personally appeared Diane M Dosdall who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity(ies) and that by ~~his~~/her/~~their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature] (Seal)
Matt Miller

MATT MILLER
Notary Public - California
San Diego County
Commission # 2278031
My Comm. Expires Feb 26, 2023



© 2017, **Unison** Form 401 HO-CA (rev. 1/31/2017)

# SCHEDULE A

## LEGAL DESCRIPTION

That certain real property situated in the City of El Cajon, County of SAN DIEGO, State of California, described as follows:

The land referred to herein below is situated in the City of El Cajon, County of San Diego, State of California and is described as follows

PARCEL A:

Parcel 1 of Parcel Map 15870, in the City of El Cajon, County of San Diego, State of California, according to Map thereof filed in the Office of the County Recorder of San Diego County, November 13, 1989.

PARCEL B:

An easement for driveway purposes over that portion of Parcel 2 of Parcel Map 15870, filed in the Office of the County Recorder of San Diego County, November 13, 1989 lying within the boundaries of that portion thereof as delineated and designated as limits of a joint-use driveway easement for ingress and egress for the benefit

of each parcel.

Said easement is appurtenant to and for the benefit of or any portion of the above described Parcel a.

APN: 386-652-33-00

[end of legal description]



Owner's Initials: DD /______/______/______

© 2017, Unison

**Prepared by, recording requested by, and when recorded mail to:**

Unison Agreement Corp.
P.O. Box 26800
San Francisco, CA 94126-6800

Unison HomeOwner Agreement ID Number:
FRX-143648

## INTER VIVOS REVOCABLE TRUST RIDER

**DEFINITIONS USED IN THIS RIDER.**

(A) "Revocable Trust." The 2015 Diane M. Dostalik Trust

(B) "Revocable Trust Trustee(s)." Diane M Dostalik as trustee(s) of the Revocable Trust.

(C) "Revocable Trust Trustor(s)." Diane M Dostalik as trustor(s) of the Revocable Trust.

(D) "Security Instrument." The Subordinated Unison Deed of Trust and Security Agreement ("Security Instrument") and any riders thereto given to secure the Unison HomeOwner Option Agreement, Unison HomeOwner Covenant Agreement and the Memorandum of Unison HomeOwner Agreement (which documents together with the Security Instrument comprise the "Unison HomeOwner Agreement"), each dated as of the Unison HomeOwner Agreement Effective Date ("Effective Date") and made by and between Unison Agreement Corp., its successors and assigns ("Beneficiary") and the Revocable Trust, the Revocable Trust Trustee(s) and the Revocable Trust Trustor(s) and any other natural persons signing the Unison HomeOwner Agreement and covering the Property (as defined below).

(E) "Property." The property described in Schedule A to the Security Instrument and located at: 2201 Weld Blvd, El Cajon, CA 92020.

**THIS INTER VIVOS REVOCABLE TRUST RIDER** is made as of the Effective Date, and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s) and the Revocable Trust Trustor(s) and the Beneficiary further covenant and agree as follows:

### A. INTER VIVOS REVOCABLE TRUST

### 1. CERTIFICATION AND WARANTIES OF REVOCABLE TRUST TRUSTEE(S)

The Revocable Trust Trustee(s) certify to the Beneficiary that the Revocable Trust is an inter vivos revocable trust for which the Revocable Trust Trustee(s) are holding full title to the Property as trustee(s).

The Revocable Trust Trustee(s) warrant to the Beneficiary that (i) the Revocable Trust is validly created under the laws of the state of CALIFORNIA; (ii) the trust instrument creating the

Revocable Trust is in full force and effect and there are no amendments or other modifications to the trust instrument affecting the revocability of the Revocable Trust; (iii) the Property is located in the state of CALIFORNIA; (iv) the Revocable Trust Trustee(s) have full power and authority as trustee(s) under the trust instrument creating the Revocable Trust and under applicable law to execute the Security Instrument, including this Rider; (v) the Revocable Trust Trustee(s) have executed the Security Instrument, including this Rider, on behalf of the Revocable Trust; (vi) the Revocable Trust Trustor(s) have executed the Security Instrument, including this Rider, acknowledging all of the terms and conditions contained therein and agreeing to be bound thereby; (vii) only the Revocable Trust Trustor(s) and the Revocable Trust Trustee(s) may hold and power of direction over the Revocable Trust; (viii) only the Revocable Trust Trustor(s) hold the power to direct the Trustee(s) in the management of the Property; (ix) only the Revocable Trust Trustor(s) hold the power of revocation over the Revocable Trust; and (x) the Revocable Trust Trustee(s) have not been notified of the existence or assertion of any lien, encumbrance or claim against any beneficial interest in, or transfer of all or any portion of any beneficial interest in or powers of direction over the Revocable Trust Trustee(s) or the Revocable Trust, as the case may be, or power of revocation over the Revocable Trust.

**2. NOTICE OF CHANGES TO REVOCABLE TRUST AND TRANSFER OF POWERS OVER REVOCABLE TRUST TRUSTEE(S) OR REVOCABLE TRUST OR BOTH; NOTICE OF CHANGE OF REVOCABLE TRUST TRUSTEE(S); NOTICE OF CHANGE OF OCCUPANCY OF THE PROPERTY; NOTICE OF TRANSFER OF BENEFICIAL INTEREST IN REVOCABLE TRUST.**

The Revocable Trust Trustee(s) shall notify the Beneficiary promptly upon notice or knowledge of any revocation or termination of the Revocable Trust, or of any change in the holders of the powers of direction over the Revocable Trust Trustee(s) or the Revocable Trust, as the case may be, or of any change in the holders of the power of revocation over the Revocable Trust, or both, or of any change in the trustee(s) of the Revocable Trust (whether such change is temporary or permanent), or of any change in the occupancy of the Property, or of any sale, transfer, assignment or other disposition (whether by operation of law or otherwise) of any beneficial interest in the Revocable Trust.

## B. ADDITIONAL HOMEOWNER(S)

The term "Owner" when used in the Security Instrument and the Unison HomeOwner Agreement shall refer to the Revocable Trust, the Revocable Trust Trustee(s) and the Revocable Trust Trustor(s), jointly and severally. Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein or by acknowledging all of the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as "Owner" on the first page of the Security Instrument, each covenant and agreement and undertaking of the "Owner" in the Security Instrument shall be such party's covenant and agreement and undertaking as "Owner" and shall be enforceable by the Beneficiary as if such party were named as "Owner" in the Security Instrument.

## C. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN THE REVOCABLE TRUST

Section 7 of the Security Instrument is amended to incorporate the following language:
**Transfer or Beneficial Interest; Transfer of the Property.**

If, without the Beneficiary's prior written consent, (i) all or any part of the Property or an interest in the Property is sold or transferred or (ii) there is a sale, transfer, assignment or other disposition of any beneficial interest in the Revocable Trust, the Beneficiary may elect to require immediate performance of all obligations secured by the Security Instrument including payment in full of any sums secured thereby, unless prohibited by federal law as of the date of the Security Instrument.

If the Beneficiary elects to require immediate performance of obligations, Beneficiary shall give Owner notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Owner must perform all obligations secured by the Security Instrument including payment in full of any sums secured thereby. If the Owner fails to pay all sums secured prior to the expiration of this period, the Beneficiary may invoke any and all remedies permitted by the Security Instrument without further notice or demand on the Owner.

BY SIGNING BELOW, the Revocable Trust Trustee(s) accept and agree to the terms and covenants contained in the Inter Vivos Revocable Trust Rider.

Diane M. Dostalik
Diane M Dostalik

4-2-2019
Date Signed

Date Signed

BY SIGNING BELOW, the Revocable Trust Trustor(s) accept and agree to the terms and covenants contained in the Inter Vivos Revocable Trust Rider.

Diane M. Dostalik, Trustee
DIANE M DOSTALIK; TRUSTEE OF THE 2015 DIANE M. DOSTALIK TRUST

4-2-2019
Date Signed

Date Signed

PLEASE COMPLETE THIS INFORMATION

RECORDING REQUESTED BY:
Vantage Point Title, Inc.

AND WHEN RECORDED MAIL TO:
Vantage Point Title, Inc.
25400 US Hwy 19 N, Ste 135
Clearwater, FL 33763
VPT File #: CA501067
VPC File #: VPC36556

DOC# 2019-0134616

Apr 15, 2019 01:34 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES: $82.00 (SB2 Atkins: $0.00)
PCOR: N/A
PAGES: 4

**ASSIGNMENT OF UNISON HOMEOWNER AGREEMENT**

(Please fill in document title(s) on this line)

The document to which this page is affixed and made a part of is exempt from the fee imposed by the Building Homes & Jobs Act (SB 2-2017) (GC 27388.1)

Reason for exemption:

- ☐ Not related to real property - GC 27388.1 (a) (1)
- ☐ Recorded concurrently "in connection with" a transfer subject to the imposition of Documentary Transfer Tax - GC 27388.1 (a) (2)
- ☐ Transfer of real property that is a residential dwelling to an owner-occupier *or* recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier - GC 27388.1 (a) (2)
- ☑ Maximum $225.00 fee per transaction reached (presented concurrently and are related to the same parties and same property) - GC 27388.1 (a) (1)

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
(Additional recording fee applies)

CCR REC 31 Rev. 1/1/2018

**Prepared by,**
**recording requested by, and**
**when recorded mail to:**

Unison Agreement Corp.
P.O. Box 26800
San Francisco, CA 94126-6800

Unison HomeOwner Agreement ID Number:
FRX-143648

**Assignment of Unison HomeOwner Agreement**

Unison Agreement Corp., a Delaware corporation, as "Assignor," hereby assigns for good and valuable consideration to **Odin New Horizon Real Estate Fund LP**, a Delaware limited partnership as "Assignee," all of Assignor's rights, title, interests and obligations to and under: (i) that certain Unison HomeOwner Option Agreement of even date herewith made by and between Assignor and DIANE M DOSTALIK , TRUSTEE OF THE 2015 DIANE M. DOSTALIK TRUST (individually or collectively, the "Homeowner"); (ii) that certain Unison HomeOwner Covenant Agreement of even date herewith made by and between Assignor and Homeowner; (iii) that certain Memorandum of Agreement made by and between Assignor and Homeowner and being recorded concurrently and on the same date as this Memorandum of Assignment; and (iv) that certain Unison Subordinated Deed of Trust and Security Agreement made by Homeowner as "Trustor" in favor of Assignor as "Beneficiary" naming American Title Inc, as "Trustee" and being recorded concurrently and on the same date as this Memorandum of Assignment; which relate to, run with and encumber the real property described in Exhibit A ("Property").

IN WITNESS WHEREOF the undersigned Assignor has executed this instrument as of 04/02/2019.

Unison Agreement Corp., a Delaware corporation

By: [signature]

Name: Daniel Eisenberg

Title: Vice President
650 California Street, Suite 1800
San Francisco, CA 94108

**ACKNOWLEDGMENT**



© 2017, Unison 

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA)
) ss.
COUNTY OF SAN FRANCISCO )

On APR 0 3 2019, ~~20~~ 19, before me Penny Mae Juco, Notary Public, personally appeared Daniel Eisenberg who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]

(seal) Penny Mae Juco

PENNY MAE JUCO
Notary Public - California
San Francisco County
Commission # 2213555
My Comm. Expires Sep 10, 2021



© 2017, Unison Form 601 HO-Multi (rev. 7/5/2017)

**EXHIBIT A**

**LEGAL DESCRIPTION**

That certain real property situated in the City of El Cajon, County of SAN DIEGO, State of California, described as follows:

The land referred to herein below is situated in the City of El Cajon, County of San Diego, State of California and is described as follows

PARCEL A:
Parcel 1 of Parcel Map 15870, in the City of El Cajon, County of San Diego, State of California, according to Map thereof filed in the Office of the County Recorder of San Diego County, November 13, 1989.

PARCEL B:
An easement for driveway purposes over that portion of Parcel 2 of Parcel Map 15870, filed in the Office of the County Recorder of San Diego County, November 13, 1989 lying within the boundaries of that portion thereof as delineated and designated as limits of a joint-use driveway easement for ingress and egress for the benefit
of each parcel.

Said easement is appurtenant to and for the benefit of or any portion of the above described Parcel a.

APN/Tax Parcel ID: 386-652-33-00

[end of legal description]



© 2017, Unison 

KIRBY & McGUINN
A PROFESSIONAL CORPORATION

Matthew H. Aguirre
Kimberley V. Deede
Jana L. Logan
Martin T. McGuinn
Roberta S. Robinson
Cheryl Edwards Tannenberg

Of counsel: Michael R. Pfeifer

707 Broadway, Suite 1750
San Diego, CA 92101-5393
(619) 685-4000

Dean T. Kirby, Jr.
Direct Voice: 619.525.1652
Direct Fax: 619.525.1651
E-Mail:dkirby@kirbymac.com

March 17, 2020

VIA FEDERAL EXPRESS
REMAX Unlimited Escrow
Attn: Peggy Escobar
568 South Brea Blvd.
Brea, CA 92821

*Re:* *2201 Weld Blvd.*
*Escrow No. 3416PE*
*Demand of Odyssey Reinsurance Company*

Dear Ms. Escobar:

As you know, this firm represents Odyssey Reinsurance Company. Odyssey Re is the judgment creditor under a judgment entered by the United States District Court for the Southern District of California against Diane M. Dostalik, which is the subject of the Abstract of Judgment recorded September 9, 2019 in the Official Records of San Diego County as Document No. 2019-0388601.

We have previously provided you with copies of a Temporary Restraining Order, Preliminary Injunction and Judgment entered in the lawsuit. Each of these court orders contains provisions to the following effect:

> ***Upon sale of the real property at 2201 Weld Boulevard, City of El Cajon, County of San Diego, State of California, having APN 386-652-33-00, the sales proceeds shall be paid to the registry of the United States District Court, Southern District of California, after deducting:***
>
> - ***Any unpaid real property taxes and assessments then due and owing;***
> - ***All sums secured by the existing first mortgage;***
> - ***Brokerage commission;***
> - ***Prorations, escrow fees, and closing costs***
>
> ***the proceeds of which shall be held pending a determination by the Court as to what extent, if any, they should be applied to satisfaction of this Judgment.***

After the Temporary Restraining Order was entered, and duly recorded to impart notice to all potential purchasers and encumbrancers, Ms. Dostalik obtained a loan from Unison

Corporation which was secured by a deed of trust describing the Weld Blvd. property. Unison contends, in bad faith, that it has the right to payment of its demand from your escrow. Unison's actions are in defiance of the injunction and constitute contempt of court. Through its counsel, Odyssey Re has repeatedly requested that Unison comply with the injunction by submitting instructions to escrow directing the payment of its demand to the Court registry. Unison has refused to comply, and its counsel has been unresponsive to further communications from counsel for Odyssey Re.

Unison's contemptuous conduct has caused, and continues to cause, damage to all parties to the escrow, including the buyers and Odyssey Re. In addition, Unison's conduct places the sale itself in immediate jeopardy. Loss of the sale would result in very substantial damage to Odyssey Re.

For these reasons, in order to mitigate further damage to the parties, **Odyssey Re has given us authority to issue the following instructions which will permit escrow to close on the basis of payment of Unison's demand:**

**Enclosed is a Release of Judgment Lien which will remove the lien of record from the Weld Blvd. property. You are authorized to use that document only if and when: (i) you have obtained my written approval of your estimated closing statement which must be otherwise consistent with the requirements of the Injunction set forth above; and (ii) hold for delivery to Kirby & McGuinn a check in the amount of the total seller's proceeds, payable to the "Registry of the United States District Court, Southern District of California" and referencing Case No. 3:16-cv-03038-BTM-WVG.**

Escrow shall have no liability to Odyssey Re in relation to the release of funds in strict compliance with the instructions and demand set forth in the preceding paragraph.

In issuing this demand and instruction, Odyssey Re does not waive, and hereby expressly reserves its right to recover from Unison, and from any other responsible party, all sums paid from escrow to Unison, and to recover damages from Unison, and from any other responsible party, including but not limited to recovery of monetary sanctions for contempt of court. Odysssey Re also reserves all lien rights, which will attach to the proceeds of sale to be deposited to the Court registry.

Very Truly Yours,

KIRBY & McGUINN, A P.C.

By: ______________________
Dean T. Kirby, Jr.

RECORDING REQUESTED BY
CHICAGO TITLE CO
AND WHEN RECORDED MAIL DOCUMENT TO:

NAME UNISON INVESTMENT MANAGEMENT

STREET ADDRESS 650 CALIFORNIA ST #1800

CITY, STATE & ZIP CODE SAN FRANCISCO, CA 94108

DOC# 2020-0177383

Apr 07, 2020 01:49 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES: $34.00 (SB2 Atkins: $0.00)
PCOR: N/A
PAGES: 3

SPACE ABOVE FOR RECORDER'S USE ONLY

SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

**Title of Document**

**Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).**

- [x] **Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of documentary transfer tax (DTT).**
- [ ] **Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier.**
- [ ] **Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.**
- [ ] **Exempt from the fee per GC 27388.1 (a) (1); not related to real property.**

**THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**($3.00 Additional Recording Fee Applies)**

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

Unison Investment Management, LLC
650 California St. Suite 1800
San Francisco, CA 94108

Attention: Home Partnership Team

ORDER NO:
ESCROW NO:

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# Substitution of Trustee and Full Reconveyance

APN: 386-652-33-00

WHEREAS, DIANE M DOSTALIK , TRUSTEE OF THE 2015 DIANE M. DOSTALIK TRUST was the original Trustor, American Title Inc. was the original Trustee, and Unison Agreement Corp. ("Unison") was the original Beneficiary under that certain Deed of Trust and Security Agreement dated as of April 2, 2019 and recorded on April 15, 2019 as Instrument Number 2019-0134615 in the Official Records of the County of San Diego, State of CA (the "Deed of Trust"), and affecting the land described in said Deed of Trust;

WHEREAS, Unison assigned all its rights, title and interest in, to and under the Deed of Trust to Odin New Horizon Real Estate Fund LP a Delaware limited partnership ("Odin") under that certain Memorandum of Assignment made as of April 2, 2019 and recorded on April 15, 2019 as Instrument Number 2019-0134616 in the Official Records of the County of San Diego, State of CA; and

WHEREAS the undersigned, Odin, is the present Beneficiary and holder of the Deed of Trust; and whereas the undersigned Beneficiary desires to substitute a new Trustee under the Deed of Trust in place and stead of, now therefore, the undersigned hereby substitutes itself as Trustee under the Deed of Trust and does hereby reconvey, without warranty, to the person or persons legally entitled thereto, the estate now held by it thereunder.

Dated: as of December 23, 2019

Odin New Horizon Real Estate Fund LP, a Delaware limited partnership

By: Odin New Horizon General Partner LLC, a Delaware limited liability company, its General Partner

Sign: [signature]

Name: Theodor Haugen

Its: Director

© 2017, Unison



Form 1011 AA (rev. 7/6/2017)

## ACKNOWLEDGMENT

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF CALIFORNIA)
) ss.
COUNTY OF SAN FRANCISCO)

On December 23rd, 2019, before me Brandan William Carlson, a Notary Public personally appeared Theodor Haugen who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

BRANDAN WILLIAM CARLSON
Notary Public – California
San Francisco County
Commission # 2215220
My Comm. Expires Sep 22, 2021

Signature [signature] (Seal)